564 So.2d 336 (1990)
DUPLESSIS CADILLAC, INC.
v.
CREATIVE CREDIT SERVICES, INC.
No. 89 CA 0429.
Court of Appeal of Louisiana, First Circuit.
April 10, 1990.
William Morvant, E. Wade Shows, Baton Rouge, for plaintiff-appellee Duplessis Cadillac, Inc.
Lee W. Rand, New Orleans, for defendant-appellant Creative Credit Services, Inc.
Richard S. Thomas, Baton Rouge, for 3rd party defendant-appellee.
Before COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
WATKINS, Judge.
Defendant-appellant, Creative Credit Services, Inc., appeals a summary judgment in favor of plaintiff-appellee, Duplessis Cadillac, Inc. (Duplessis), an automobile dealership located in Baton Rouge, Louisiana. The suit involves the sale of two Cadillacs by Duplessis, and the primary issue is to whom did Duplessis sell. Four companies became involved in the sale, in varying degrees of involvement. They are:
(1) United Leasing of America, Inc. (ULA), a company located in the state of Maryland;
(2) United Leasing of America at Baton Rouge, Inc. (ULABR), a local franchisee of ULA;
(3) Creative Credit Services, Inc. (CCS), the defendant-appellant;
and
*337 (4) General Electric Credit Auto Lease[1] (GECAL), a sister company of CCS.
Duplessis claims that it sold the two vehicles to CCS, through CCS's agent, ULA. Contrarily, CCS claims that ULA purchased the vehicles on its own behalf, executed leases of the vehicles, and then assigned the leases and sold the vehicles to CCS. Considering the affidavits, depositions, and other documents filed in support of and in opposition to the motion for summary judgment, the trial court concluded that CCS, having ratified the acts of its agent ULA, was the actual purchaser of the vehicles. We find that the trial court was in error: the undisputed facts fail to show either agency or ratification.

FACTS
Duplessis is an automobile dealership engaged in the retail sale of automobiles. Duplessis does not enter into direct lease agreements with its customers. However, when a customer requests a lease and does not have his own lease financing, Duplessis contacts outside lease companies in order to assist the customer. In the summer of 1986 two customers, Williams and Raggio, requested leases on Cadillacs. To obtain lease financing Duplessis contacted ULABR and forwarded the customer credit applications to ULABR. Thereafter ULABR sent the information concerning these customers to several lease finance companies for their approval. ULABR received approval on both the Williams and Raggio applications from GECAL. Once ULABR received approval on the applications from GECAL, the customers went to the ULABR office and executed the leases. When the leases were completed, ULABR submitted purchase orders to Duplessis for the two vehicles and informed Duplessis that each vehicle be titled to CCS[2]. Each purchase order was signed by Greg Dunaway, a lease manager at ULABR, and each purchase order requested the vehicle to be shipped to ULABR. Thereafter, ULABR forwarded all the paperwork to ULA in Maryland by Federal Express. ULA executed the lease agreements[3] and forwarded two separate drafts to Duplessis for the full amount owed on the vehicles. Duplessis accepted the ULA drafts in payment for the automobiles. Unfortunately, neither the drafts nor two substituted checks were honored by ULA. Prior to dishonor and without knowledge that the ULA drafts were dishonored, GECAL/CCS paid ULA the sum of $21,696.78 for the Williams vehicle, and $21,503.13 for the Raggio vehicle. Subsequently ULA filed Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Columbia.
After its unsuccessful attempts to recover directly from ULA, Duplessis filed this suit against CCS, alleging that CCS was the purchaser of the vehicles.[4] Thereafter, Duplessis filed a motion for summary judgment alleging that ULA and ULABR acted in a representative or agency capacity on behalf of CCS and that CCS should bear the loss of ULABR/ULA's insolvency. Denying that any agency relationship existed, CCS urged that there occurred two separate and distinct arms-length transactions: the first between Duplessis and ULABR/ULA; the second between ULABR/ULA and GECAL/CCS. Additionally, CCS argued that there existed material facts at issue that precluded the granting of a summary judgment.

SUMMARY JUDGMENT
Summary judgment should only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to material fact, and the mover is entitled to judgment *338 as a matter of law. LSA-C.C.P. art. 966.
In support of its motion for summary judgment the plaintiff offered the affidavits of Glen Johnston and Gary Dunaway. Mr. Johnston and Mr. Dunaway were employed by ULABR as lease managers at the time of the transactions involving the Williams and Raggio vehicles. The affidavits state that Mr. Johnston and Mr. Dunaway negotiated the purchase of the vehicles from Duplessis as agents for CCS; that at the time of the sale, Duplessis Cadillac, Inc., was fully informed of the agency status; that the affiants were at all times representing CCS who was their principal and the purchaser of the vehicles. The affidavits also state that the vehicles were titled in the name of CCS and that CCS did obtain possession of the vehicles following the sale in question.
We find the affidavits in support of plaintiff's motion for summary judgment insufficient to support the granting of summary judgment in favor of the plaintiff. The affidavits merely state conclusions of the affiants and fail to set forth any factual bases for those conclusions. LSA-C.C.P. art. 967. The affidavits are devoid of any facts supporting the conclusory statement that ULABR/ULA was the agent of GECAL/CCS.
Under La.C.C.P. Art. 967 it is insufficient for an affiant to merely declare he has personal knowledge of a fact. The affidavit must affirmatively establish that the affiant is competent to testify to the matter stated by a factual averment showing how he came by such knowledge.
Barham & Churchill v. Campbell & Associates, 503 So.2d 576, 579 (La.App. 4th Cir.), writ denied, 503 So.2d 1018 (La.1987). Consequently the trial court should not have given any weight to the affidavits.
However, the depositions of Mr. Dunaway and Mr. Johnston were filed into the record prior to the trial court's decision and may be considered for the purposes of summary judgment. See Johnson v. Slidell Memorial Hospital, 552 So.2d 1022 (La. App. 1st Cir.1989), writ denied, 558 So.2d 571 (La.,1990) (No. 90-C-0125).[5] Also filed into the record were the depositions of Clarence Lee, the comptroller for Duplessis; Frederick Pace, the sales manager for Duplessis; and Lura Reed, the title clerk for Duplessis.
The undisputed deposition testimony fails to show that either GECAL or CCS ordered or directed ULA to purchase the vehicles, or that anyone associated with GECAL/CCS contacted Duplessis concerning ULABR's scope of authority in regard to the purchase of the Williams and Raggio vehicles. After being contacted by ULABR, GECAL merely approved the credit of Williams and Raggio and requested that ULABR/ULA have the vehicles titled in the name of CCS.
In opposition to the motion for summary judgment defendant offered an affidavit which denied the existence of an agency relationship between GECAL/CCS and ULABR/ULA. In support of this affidavit defendant attached several documents which included two purchase orders from ULABR to Duplessis, ordering the Williams and Raggio vehicles, and two drafts from ULA to Duplessis for the full amounts owed on the Williams and Raggio vehicles.
Considering the deposition testimony of Mr. Dunaway, Mr. Johnston, Mr. Lee, Mr. Pace and Ms. Reed, we agree with the trial court that there appears to be no dispute as to the material facts surrounding the sales of the Williams and Raggio vehicles. Nevertheless, Duplessis failed to prove that ULABR/ULA was an agent for CCS or that CCS ratified the acts of ULABR/ULA.
An agency relationship is never presumed. In Louisiana an agency relationship is created by either express appointment of a mandatary under LSA-C.C. art. 2985, or by implied appointment arising *339 from apparent authority. Therefore, an agent's authority is composed of his actual authority, express or implied, together with the apparent authority which the principal has vested in him by his conduct. Boulos v. Morrison, 503 So.2d 1 (La.1987).
The doctrine of apparent authority applies only when the principal acts to manifest the alleged agent's authority to an innocent third party and the third party reasonably relies on the manifested authority of the agent. Id. The burden of proving the existence of apparent authority is on the party relying on the mandate. Id.
"A third party seeking to benefit from the doctrine of apparent authority may not blindly rely upon the assertions of an agent. He has a duty to inquire into the nature and extent of the agent's power." Boulos, 503 So.2d at 3.
The following principles of ratification are enunciated in Bamber Contractors v. Morrison Engineering, 385 So.2d 327, 331 (La.App. 1st Cir.1980):
Unless a principal expressly ratifies the acts of an agent who has exceeded his authority, the agent alone is bound. LSA-C.C. Arts. 3010, 3013, 3021.
Ratification, in the law of agency, is the adoption by one person of an act done on his behalf by another without authority. Ratification amounts to a substitute for prior authority. The burden of proving ratification is on the party asserting it, and to find ratification of an unauthorized act, the facts must indicate a clear and absolute intent to ratify the act, and no intent will be inferred when the alleged ratification can be explained otherwise. Ratification will occur when the principal, knowing of the contract, does not repudiate it but accepts its benefits. (Citations omitted.)
Having based his judgment on ratification, the trial judge correctly concluded that there existed no express agency relationship between CCS and ULABR/ULA. However, the facts as presented on motion for summary judgment do not support a finding of implied or apparent authority, nor do they support a finding of ratification.
The fact that the vehicles were titled to CCS as the owner does not overcome the fact that ULABR/ULA ordered and paid for the vehicles in its own name, and that ULABR/ULA made a profit from the transactions which it determined through its separate negotiations with Duplessis and GECAL/CCS. Furthermore, an intent to ratify the acts of ULABR/ULA cannot be inferred from the fact that CCS kept the vehicles. CCS paid ULABR/ULA the agreed upon price for the vehicles which included ULABR/ULA's profit on the resale. Contrary to the mover's position, the undisputed facts at this stage of the litigation[6] suggest that ULABR/ULA was a principal in this transaction and not merely an agent or a broker. Cf. Nasco Equipment Co. v. Briggs-Weaver, Inc., 487 So.2d 625 (La.App. 4th Cir.1986). In Nasco, defendant, an equipment dealer, was held responsible to the manufacturer for payment of a bulldozer supplied through the dealer to one of the dealer's customers, but never paid for by the customer. The manufacturer had agreed to and, in fact, did bill the customer instead of the dealer, at the dealer's request. The dealer was paid a fee based on the difference between the retail and wholesale prices of the bulldozer, and the dealer was to perform both predelivery service and postdelivery warranty work.[7]
*340 For the reasons set forth we reverse the trial court's judgment granting summary judgment in favor of Duplessis Cadillac, Inc. This case is remanded for further proceedings consistent with this opinion. Costs to await the final disposition of this matter.
REVERSED AND REMANDED.
SHORTESS, J., concurs with reasons.
SHORTESS, Judge, concurring.
I agree with the majority that the case should be remanded to the trial court. I am concerned, however, with what I perceive as an implication that Duplessis should bear the risk of ULA's insolvency. Nasco involved a customer who breached his contract; the issue there was whether the middleman could escape liability to the dealer by invoking broker/agent status. Normally, a broker would have no responsibility for either principal's breach.
Here, the supplier (Duplessis) is attempting to avoid the consequences of the middleman's (ULA's) breach by imposing broker/agent status on ULA, thus making CCS (the customer) liable as principal for its agent's insolvency. If, as the opinion indicates, ULA was not a broker/agent but rather a principal/dealer, it would seem that CCS was in a better position than Duplessis to anticipate the risk of ULA's insolvency, and should bear the loss as part of its regular business dealings with ULA. Duplessis, primarily in the business of selling cars, entered into very few lease transactions; CCS's business was buying leases. However, I believe that until more facts are developed at trial, we should refrain from any dicta which would seem to reach the merits of the case.
I respectfully concur.
NOTES
[1] Apparently both GECAL and CCS are wholly owned subsidiaries of General Electric Credit Corporation.
[2] GECAL's policy was that all vehicles it purchased for the purpose of putting under lease be titled to CCS.
[3] ULA's president, Greg Dutcher, signed the lease agreements as lessor.
[4] CCS filed a third party demand against ULABR and its surety, United States Fidelity & Guaranty Co., for all sums which CCS may be held liable for on the original demand.
[5] Portions of these depositions were offered by the defendant in its opposition to the motion for summary judgment. Each deponent contradicted the conclusory statements made in his affidavit.
[6] CCS merely opposed the motion for summary judgment and did not file a counter motion for summary judgment.
[7] A further discussion of Nasco and similar cases involving a middleman as a broker or dealer is found in Morris, Developments in the Law, 1985-1986, 47 LLR 235 (1986), and provides in pertinent part as follows:

When one of the three parties in a supplier-middleman-customer deal becomes insolvent while still owing performance to one of the other parties, the nature of the relationship among the three becomes critical. If the middleman is simply a broker, i.e., an agent for one or both of the other parties, he will not be held responsible either to the supplier or to the customer for the breach of the other's promise. Each must look solely to the other principal, and not to the representative in the middle, for contractual performance. If the middleman is not a broker, however, but instead a principal who undertakes to buy goods and to resell them at a profit, then he is the party that must bear the loss first when either or both sides of his contemplated buy-sell arrangement do not work out as planned. Similarly, because the supplier and customer have no contract with each other, but only related contracts with the dealer, the dealer's failure to perform must be suffered by the aggrieved party without recourse to the supplier or customer on whose performance the dealer was relying.