746 So.2d 246 (1999)
Pam CARTINEZ, Plaintiff-Appellee,
v.
RELIABLE AMUSEMENT CO., INC., et al.
[Reliable Amusement Co., Inc. Defendant-Appellant].
No. 99-333.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1999.
Writ Denied February 4, 2000.
*247 Van Hardin Kyzar, Natchitoches, for Pam Cartinez.
Guy Earl Wall, New Orleans, for Reliable Amusement Co., Inc., et al.
Before THIBODEAUX, PETERS, and GREMILLION, Judges.
PETERS, J.
The plaintiff, Pam Cartinez, filed suit against Reliable Amusement Company, Inc., and Gorman Avery, d/b/a G & G Enterprises, alleging that she entered into an employment contract with the defendants, that she performed services as specified in the contract, and that the defendants failed to compensate her for her services. In her suit, Mrs. Cartinez sought specific performance of the contract as well as a judgment for all past and future sums due her under the contract. Issue was never joined regarding Gorman Avery (Avery), and the matter went to trial with Reliable Amusement Company, Inc. (Reliable), as the only defendant. Upon completion of the trial, the trial court rendered judgment in favor of Mrs. Cartinez and against Reliable, awarding her $308,404.00, together with legal interest, as unpaid compensation. The trial court further awarded Mrs. Cartinez judgment for thirty percent of all "net to operator" revenues accruing from February 28, 1998, forward in all but two video poker locations operated by Reliable in Sabine Parish, Louisiana. Reliable appeals this judgment, asserting four assignments of error. For the following reasons, we reverse the trial court's judgment and render judgment in favor of Reliable, dismissing Mrs. Cartinez's claim.
*248 This litigation has as its origin the passage in 1991 of the Video Draw Poker Devices Control Law, La.R.S. 33:4862.1 et seq. (redesignated by Acts 1996, 1st Ex. Sess., No. 7, § 3, eff. May 1, 1996, as La.R.S. 27:301 et seq.), which allowed the distribution and operation of video poker machines in certain qualified and licensed Louisiana commercial establishments.[1] In early 1992, those establishments eligible to become qualified and licensed under the law became the target of competing distributors intent on procuring locations to place their video poker machines. Reliable was one of those competing distributors.
Basically, these distributors would contact the eligible commercial establishments (bars, lounges, and restaurants with liquor licenses) and induce the owners or operators to sign exclusive distributorship contracts. The contract Reliable offered provided that it would install "state of the art" video poker machines in the eligible establishment, service the machines, and collect the generated revenue. In exchange for providing locations for its machines, Reliable agreed to divide the proceeds equally with the establishment proprietor after a "deduction of all fees charged by the State of Louisiana as well as all local, state and federal licensing costs and other expenses."
Soon after its incorporation in February of 1992, Reliable entered into a business relationship with Avery whereby Avery became a router/operator for the corporation's western Louisiana operation. Avery's responsibilities as a router/operator included procuring video poker locations,[2] installing the machines at the locations, servicing the machines, and collecting the revenue produced by the machines. In exchange for these services, Reliable agreed to compensate Avery by paying him thirty percent of Reliable's share of the profits at any location he acquired and serviced.
In early May 1992, Avery approached Mrs. Cartinez, a lifelong resident of Sabine Parish, and sought her assistance in acquiring Sabine Parish locations for Reliable's machines. According to Mrs. Cartinez, Avery told her he was a good friend of Reliable's owner, that he represented Reliable in Sabine Parish, and that he had the authority to negotiate a contract with her. As a result of their conversations, and at the request of Mrs. Cartinez, Avery produced a written contract which reads as follows:
This WORK CONTRACT shall be by and between G and G Enterprises hereinafter known as ("G & G"), operator/router for Western Louisiana for Reliable Amusement Co., Inc., exclusive marketer and installer of Sigma Game, Inc. video poker machines in the State of Louisiana approved for use in the Louisiana Video Poker Lottery Law monitored by the Louisiana State Police passed into law February 5, 1992
and
Pam Cartinez, Route 1, Box 338-A, Zwolle, Louisiana 71486, hereinafter known as ("PC");
G & G shall provide the following to PC:
A. furnish all sales materials, brochures, business cards, information *249 sheets, etc. and assist PC in the sale and placement of the video poker machines.
B. provide the names of prospects with Class A licenses in the sales area to PC.
C. provide assistance for the customer to prepare the application for approval of the establishment to be licensed by the State Police.
D. secure the equipment, telephone lines to be installed and complete the installation of said equipment.
E. help train the customer in operation for patron use.
F. provide the funds to the customer as needed, e.g., license fees, notary fees, telephone costs, remodeling costs if needed.
G. public relations with customers.
H. equipment repair.
I. collection of proceeds from the machines.
J. anything else that will further the profit for Reliable, G & G, and PC, as well as the customer.
In turn PC shall be expected as an employee to do the following:
A. make sales presentations to prospects and obtain an order if possible.
B. assist customer in preparing establishment application form to State Police for approval.
C. once approval is obtained assist customer in preparing site for installation of equipment, telephone lines, etc.
D. once installed equipment is in place and functioning be called upon to collect proceeds at customer's site and forward to Reliable for payment to all involved.
E. train customers in operation of equipment for patron use.
F. public relations with customers.
G. other assignments created by G & G in this endeavor to further the profit to Reliable, G & G, and PC.
For performing the above duties for G & G, PC shall receive thirty (30%) percent of the NET to OPERATOR column, an example so marked and attached as part of this WORK CONTRACT for each and every device that is placed by PC directly or indirectly by virtue of lending assistance to any employee of G & G or Reliable in placing of such device as long as PC remains an employee of G & G. Upon termination of this contract PC shall immediately cease to receive such compensation. This WORK CONTRACT may be cancelled at any time on the part of PC. This WORK CONTRACT may be cancelled by G & G when it is determined that PC is no longer performing those duties required by this contract or when it has been determined that some act of fraud, misrepresentation, or dishonesty has occurred on the part of PC.
Compensation shall be made to PC each and every time that Reliable forwards G & G its share of the proceeds for disbursement. This could be weekly, bi-weekly or monthly.
This WORK CONTRACT is effective upon signing by both parties.
Signed this ___ day of May 1992
______________________________
G and G Enterprises
Operator/Router for
Reliable Amusement Co., Inc.
______________________________
Pam Cartinez, Employee
Route 1, Box 338-A
Zwolle Louisiana 71486
On May 8, 1992, Avery and Mrs. Cartinez executed the contract. A few days later, Avery supplied her with printed business cards and form contracts for the business establishments to sign.
Thereafter, Mrs. Cartinez began making contacts with local business establishments on behalf of Reliable. She personally negotiated location contracts on behalf of Reliable with Grace's Landing (May 28, 1992), the Coon Ridge Lounge (June 3, 1992), the Border Lounge (June 15, 1992), and the Dry Hole Bar (July 6, 1992). When each of these contracts was consummated, she signed the contract as the representative *250 of Reliable. Mrs. Cartinez also asserts, and the trial court found, that she was instrumental in acquiring fourteen other contract locations for Reliable in Sabine Parish.[3]
Although Reliable received its share of the revenue produced by these eighteen locations, it paid no portion of that revenue to Mrs. Cartinez. On November 13, 1995, or some three and one-half years after executing the May 8, 1992 contract, Mrs. Cartinez brought this action. On July 30, 1998, the trial court rendered written reasons for judgment in favor of Mrs. Cartinez, and on September 4, 1998, the trial court signed a written judgment incorporating the reasons for judgment. In its appeal, Reliable asserts four assignments of error. Because we find merit in the first assignment of error requiring reversal of the trial court judgment, we need not consider the other three assignments.

OPINION
In its reasons for judgment, the trial court restated its conclusion reached immediately at the conclusion of the evidence "that a valid contract existed between [Mrs. Cartinez] and [Reliable] and that Gorman Avery was an agent authorized to contract on behalf of Reliable and that Reliable knew of and accepted the benefits of the work Mrs. Cartinez performed pursuant to the terms of the contract." Further, it found that the May 8, 1992 contract was "not subject to any ambiguity." In its first assignment of error, Reliable asserts that these conclusions are erroneous. Reliable argues that Avery was not its agent and had no express or apparent authority to enter into contracts on its behalf and that it never ratified the contract.
An excellent summary of the law relative to agency relationships as they existed when this issue arose is found in Barrilleaux v. Franklin Foundation Hospital, 96,0343, pp. 6-7 (La.App. 1 Cir. 11/8/96); 683 So.2d 348, 353-54, writ denied, 96-2885 (La.1/24/97); 686 So.2d 864, which we quote with approval:
An agent is one who acts for or in place of another by authority from the latter. Oliver v. Central Bank, 26,932 p. 8 (La.App. 2nd Cir.5/10/95); 658 So.2d 1316, 1321, writ denied, 95-1469 (La.9/22/95); 660 So.2d 477; Martin Fuel Distributors, Inc. v. Trans Gulf Fuel, Inc., 496 So.2d 473, 476 (La.App. 1st Cir.), writ denied, 498 So.2d 753 (La.1986). An agency relationship may be created by express appointment of a mandatary under LSA-C.C. art. 2985 or by implied appointment arising from apparent authority. Oliver v. Central Bank, 658 So.2d at 1321; Urbeso v. Bryan, 583 So.2d 114, 117 (La.App. 4th Cir.1991); Duplessis Cadillac, Inc. v. Creative Credit Services, Inc., 564 So.2d 336, 338-39 (La.App. 1st Cir.1990). Therefore, an agent's authority is composed of his actual authority, express or implied, together with the apparent authority which the principal has vested in him by his conduct. Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Duplessis Cadillac, Inc. v. Creative Credit Services, Inc., 564 So.2d at 339. As between principal and agent, the limit of an agent's authority to bind the principal is governed by the agent's actual authority. However, as between principals and third parties, the limit of an agent's authority to bind the principal is governed by the agent's apparent authority. Boulos v. Morrison, 503 So.2d at 3.

*251 Implied or apparent agency exists if the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal. Urbeso v. Bryan, 583 So.2d at 117. Apparent agency arises when the principal has acted so as to give an innocent third party a reasonable belief that the agent had the authority to act for the principal, Urbeso v. Bryan, 583 So.2d at 117; Davidson v. Board of Trustees, State Employees Group Benefits Program, 481 So.2d 708, 711 (La.App. 1st Cir. 1985), and the third party reasonably relies on the manifested authority of the agent. Duplessis Cadillac, Inc. v. Creative Credit Services, Inc., 564 So.2d at 339; Tate v. Hanover Insurance Company, 526 So.2d 1302, 1305 (La.App. 3rd Cir.), writ denied, 530 So.2d 569 (La. 1988). Apparent agency is established by the words and conduct of the parties and the circumstances of the case. An agency relationship may be created even though there is no intent to do so. Urbeso v. Bryan, 583 So.2d at 117; Sales Purchase Corporation v. Puckett, 417 So.2d 137, 140 (La.App. 2nd Cir.), writ denied, 421 So.2d 250 (La.1982).
The distinction between actual and apparent authority of an agent to bind a principal in a business transaction has been further clarified by the supreme court as follows:
Apparent authority is a doctrine by which an agent is empowered to bind his principal in a transaction with a third person when the principal has made a manifestation to the third person, or to the community of which the third person is a member, that the agent is authorized to engage in the particular transaction, although the principal has not actually delegated this authority to the agent. In an actual authority situation the principal makes the manifestation first to the agent; in an apparent authority situation the principal makes this manifestation to a third person. However, the third person has the same rights in relation to the principal under either actual or apparent authority. Further, apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this.
Tedesco v. Gentry Dev., Inc., 540 So.2d 960, 963 (La.1989) (citations omitted) (footnote omitted).
Further, as stated in Barrilleaux, 683 So.2d at 354:
An agency relationship is never presumed; it must be clearly established. Fleet Finance, Inc. v. Loan Arranger, Inc., 604 So.2d 656, 658 (La.App. 1st Cir.1992); Duplessis Cadillac, Inc. v. Creative Credit Services, Inc., 564 So.2d at 338. The burden of proving apparent authority is on the party seeking to bind the principal. A third party may not blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purportedly granted by the principal permits the proposed act by the agent. Desormeaux v. Lalonde, 578 So.2d 226, 230 (La.App. 3rd Cir.), writs denied, 581 So.2d 705 and 706 (La.1991); Duplessis Cadillac, Inc. v. Creative Credit Services, Inc., 564 So.2d at 339. One must look from the viewpoint of the third party to determine whether an apparent agency has been created. AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc., 385 So.2d 426, 429 (La.App. 1st Cir.1980). A trial court's determination as to whether an apparent agency exists will not be reversed in the absence of manifest error. See Boulos v. Morrison, 503 So.2d at 3.
The testimony concerning Avery's authority to contract on behalf of Reliable included that of Mrs. Cartinez; Linda Simpson Manning, a Reliable employee from June or July 1992 through September 1993; Bobby Dale Presson, Sr., Reliable's manager of its Natchitoches Parish office from late June or early July 1992 to sometime in 1995; and Craig Tullos, who *252 would only identify himself as an employee of Reliable.
Mrs. Cartinez presented the only direct testimony concerning the particulars of her contract negotiations with Avery. At the time of her meeting with Avery, Mrs. Cartinez had been employed by the Sabine Parish School Board as a secretary for some fourteen years, and her husband, Jerry, was employed as a supervisor at Williamette Industries in Zwolle, Sabine Parish, Louisiana. The couple had owned and operated Jerry's Package Store in Zwolle for a few years, having acquired it from Mr. Cartinez's father. According to Mrs. Cartinez, a few days before she met Avery, he made a solicitation call on the liquor store and spoke with her husband. Mrs. Cartinez testified that Avery asked her husband whether he knew of anyone who could assist him in securing Sabine Parish locations for Reliable's machines. Mr. Cartinez suggested he speak with his wife, and a few days later, Avery returned to the liquor store to discuss with Mrs. Cartinez the possibility of securing her assistance. The discussion resulted in the previously mentioned assurances from Avery and the written contract at issue in this litigation.
Tullos testified that only he had authority to enter into employment contracts on behalf of Reliable and that Avery was not a Reliable employee in 1992. Based on the initial agreement between Reliable and Avery, he was carried as an independent contractor in Reliable's records. No evidence was presented to contradict this testimony.
We find that the trial court was clearly wrong in finding that Mrs. Cartinez established Avery to be the express or apparent agent of Reliable. There is no evidence that Reliable gave Avery actual authority to contract with Mrs. Cartinez. Additionally, at the time the contract was executed, Reliable had made no manifestation to her or her community that Avery was authorized "to engage in the particular transaction" involved herein. Tedesco, 540 So.2d at 963. Furthermore, Reliable had done nothing prior to May 8, 1992, to give Mrs. Cartinez a reasonable belief that Avery functioned as its agent and had authority to enter into this contract.
These conclusions are supported by the contract itself, which provides that it is between G & G Enterprises and Mrs. Cartinez and that G & G Enterprises, and not Reliable, would provide all materials, supplies, assistance, and training. Mrs. Cartinez did not rely on the clear and unambiguous language of the contract but relied entirely on Avery's assertions. Mrs. Cartinez specifically testified that before meeting Avery, she had never heard of Reliable and that her whole belief in the nature of the contractual relationship was based on what Avery told her. As stated in Barrilleaux, 683 So.2d at 354, "[a] third party may not blindly rely on the assertions of an agent" to establish an apparent agency relationship. See also, Desormeaux v. Lalonde, 578 So.2d 226 (La.App. 3 Cir.), writs denied, 581 So.2d 705, 706 (La.1991). In fact, "it is a well-established rule that the declarations and representations of an alleged or reputed agent are not admissible evidence to prove the fact of his agency against the principal." Lou-Ark Equip. Rentals Co. v. Hong Ah Fong, 355 So.2d 1019, 1021 (La.App. 4 Cir.), writ denied, 357 So.2d 1167 (La.1978). Thus, we find that the trial court was clearly wrong in concluding that Avery was the agent of Reliable and that the May 8, 1992 contract constituted a contract between Reliable and Mrs. Cartinez.
We also do not find that the evidence is sufficient for the trial court to have concluded that Reliable ratified the contract.
Ratification in the law of agency is the adoption by one person of an act done on his behalf by another without authority. In order for ratification to occur, the person to be bound must, with full knowledge of all material facts, express *253 an interest to adopt the unauthorized acts.
ODECO Oil & Gas Co. v. Nunez, 532 So.2d 453, 464 (La.App. 1 Cir.1988), writ denied, 535 So.2d 745 (La.1989) (citations omitted).
Just as Mrs. Cartinez's reliance on Avery's statements concerning the existence of his agency relationship with Reliable is not sufficient to bind Reliable as the principal in the May 8 contract, there is no evidence that Reliable had full knowledge of all material facts or expressed any interest in adopting the contract as its own and thereby becoming liable to Mrs. Cartinez for compensation. What little evidence that exists suggests the contrary.
Presson testified that he was aware Mrs. Cartinez assisted Avery in soliciting Sabine Parish locations and that both Avery and Mrs. Cartinez had related to him that Mrs. Cartinez was to get a percentage of the profit from the locations she signed up or helped to sign up. According to Presson, Mrs. Cartinez mentioned that she was owed money on two separate occasions. On neither occasion did she relate to him the particulars of the relationship. When she first complained to him, he mentioned it to Tullos, his immediate supervisor. He later reported a second conversation with Mrs. Cartinez to Reliable's main office and concerning that conversation, he stated the following:
On the second occasion Ms. Cartinez come to me, she was getting a little anxious about the situation. And I don't remember, it was....I guess that was in '93 or '94. And she mentioned to me that she had been promised the compensation and that if she didn't get it she was going to file a lawsuit. Well it wasn't....I wasn't authorized to pay any of those ....any compensation like that. And I didn't....I just mentioned it to Craig and told him that the lady was getting upset, and she said she was going to file a lawsuit, and let it go at that. I think Craig said something of the nature, well, we'll take care of it, or we'll see to it, or we'll have to address it. But I never mentioned it to him again.
Nothing in this conversation with Tullos would suggest that Reliable agreed to pay Mrs. Cartinez.
Ms. Manning could testify only that Mrs. Cartinez "helped solicit contracts in Sabine Parish and she did some service work," that Reliable provided her with form contracts to solicit locations, and that Reliable made the arrangements for her to attend certification school so that she could do the service work. She was also aware that, in some instances, Mrs. Cartinez signed contracts on behalf of Reliable. She recalled overhearing a conversation between Mrs. Cartinez and Presson around Labor Day of 1992 wherein Mrs. Cartinez stated that "she was going to be paid a commission, and she said that she couldn't wait till she got paid." However, Ms. Manning did not know by whom Mrs. Cartinez expected to be paid. When Ms. Manning was initially hired, her responsibilities included writing checks on behalf of Reliable, but only at Presson's instruction. She acknowledged writing payroll checks to individuals employed to perform the same services performed by Mrs. Cartinez but testified that she never wrote a check for Mrs. Cartinez. Avery was among those for whom Ms. Manning regularly wrote checks.
Mrs. Cartinez testified that she discussed her compensation several times with Avery, who kept telling her to "give the company time to get on their [sic] feet and make money." He always assured her she would get her commissions. She testified that she also discussed the commissions with Presson, who always encouraged her with the same promise. Additionally, she testified that on two separate occasions, Nick Gazardo, one of Reliable's employees, discussed with her how pleased the company was with her efforts. On one occasion, he called her to express his appreciation, and on another occasion, the July 4, 1992 weekend, he and another employee came to visit her personally and *254 express the company's appreciation for her hard work.
In contrast to this testimony, Tullos testified that Avery never informed anyone in the Reliable organization that he had entered into the contract with Mrs. Cartinez and denied having any discussions with Presson concerning her status. According to Tullos, he became aware of the contract's existence only when Mrs. Cartinez filed suit. However, he acknowledged that the Natchitoches office records contained a copy of the contract, which he produced at trial. He asserts that the testimony of Ms. Manning and Presson should be discounted because Reliable fired both of them and brought criminal charges against them when they left the company.
Even had Reliable been supplied with a copy of the May 8 contract, nothing in that document would suggest it had any obligations other than to pay Avery under its agreement with him. The agreement provides that Mrs. Cartinez was to be paid from the funds forwarded to G & G (Avery) by Reliable and not directly by Reliable. Avery received regular payments from Reliable, but did not fulfill his obligation to Mrs. Cartinez to pay her. However, Reliable had, and assumed, no responsibility in that regard. Therefore, we conclude that the trial court erred in finding that Reliable ratified the May 8 contract as its own.

DISPOSITION
For the foregoing reasons, we reverse the trial court's judgment in favor of Pam Cartinez and render judgment in favor of Reliable Amusement Company, Inc., dismissing Mrs. Cartinez's demands against it with prejudice. All costs are taxed against Pam Cartinez.
REVERSED AND RENDERED.
NOTES
[1] La.R.S. 27:301(B)(8) (formerly La.R.S. 33:4862.1(A)(8)) defines a "licensed establishment" as "an establishment that has a Class AGeneral retail permit or a Class ARestaurant permit ... for the sale of alcoholic beverages for on-premises consumption or a Louisiana state racing commission licensed race track, pari-mutuel wagering facility, or offtrack wagering facility, or a qualified truck stop facility as defined in R.S. 27:306 [formerly La.R.S. 33:4862.6]."
[2] Procurement of locations entailed securing contracts with the location owners; preparing the necessary applications to the Louisiana State Police Video Gaming Commission; performing any remodeling required to meet regulations; and, if necessary, acquiring liquor permits.
[3] These other establishments were identified as Take Ten, Jerry's Package Liquor, Sam's Restaurant, B.J.'s Grocery and Game Room, Herman's Game Room, Carol's Jiffy Stop, Slow Polk's, Country Girl Game, the Fort, Tommy's Restaurant, Sepulvado's Landing, the 171 Package Liquor Store, the Tobacco Warehouse, and Bend Inn.