STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-354


HUBERT VERSTICHELE

VERSUS

RICHARD A. MARRINER

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2003-5735
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

JOHN B. SCOFIELD
JUDGE

**********

Court composed of Sylvia R. Cooks, Marc T. Amy, and John B. Scofield, Judges.

AFFIRMED.

John H. Clegg
Benjamin Owen Schupp
643 Magazine St.
New Orleans, LA 70130
Counsel for Plaintiff-Appellant
        Hubert Verstichele

James Buckner Doyle
930 Lakeshore Drive
Lake Charles, LA 70602-2142
Counsel for Defendant-Appellee
        Richard A. Marriner

Rick Charles Normand
P. O. Box 3731
Lake Charles, LA 70602
Counsel for Defendant-Appellee
        Richard A. Marriner

SCOFIELD, Judge[*].

Plaintiff-Appellant, Hubert Verstichele, is a resident of Belgium and appeals the trial court's granting of Defendant's Exception of No Right of Action. Verstichele had obtained a Judgment against Richard A. Marriner, a resident of Calcasieu Parish, Louisiana, in a Belgian court. Marriner's Exception of No Right of Action was granted by the trial court on the basis that the Belgian court had lacked personal jurisdiction over Marriner. For the reasons set forth hereinafter, we affirm.

**TRIAL COURT PROCEEDINGS**

Verstichele filed an Ex Parte Petition in the Fourteenth Judicial District Court seeking recognition of a Judgment rendered on June 28, 2000, by the court of the First Instance in Gent, Belgium. Marriner, a resident of Calcasieu Parish, filed several exceptions to the petition alleging lack of subject matter jurisdiction, unauthorized use of summary proceedings, improper service and no right of action. The exception of no right of action is based on the Belgian court's lack of *in personam* jurisdiction and subject matter jurisdiction.

An evidentiary hearing was held on November 19, 2003, resulting in the trial court denying all of Marriner's exceptions except the exception of no right of action, the trial court finding that the Belgian court lacked personal jurisdiction over Marriner. A formal judgment dismissing Verstichele's lawsuit was signed by the trial court on December 8, 2003. An Order of Devolutive Appeal was granted to Verstichele on January 5, 2004.

---

[*] John B. Scofield, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**THE FACTS**

Where a party seeks recognition by a Louisiana court of a foreign judgment, the Louisiana court is limited in its ability to consider facts, especially those pertaining to the merits of the underlying case. However, we will recite facts which arguably bear on the merits, because for the most part, they are undisputed and their recitation will assist in placing this matter into proper context. Moreover, where personal jurisdiction is being challenged, facts pertaining to that issue may be considered by our courts.

Marriner is a Lake Charles businessman, having for many years been the owner of the Budweiser beer distributorship serving Southwest Louisiana. At some time prior to December of 1981, more than likely in the late 1970's, Marriner was involved in a venture promoting the sale of real estate in the state of Vermont. Through a mutual friend, Marriner became acquainted with one Onno Kamerling, a businessman from Holland. It seems that Marriner and Kamerling eventually reached a verbal understanding that Kamerling would promote the sale of the Vermont property to residents of Holland, although Kamerling was given no limitations on the place of residence of those whom he was to promote. According to Marriner, Kamerling thereafter brought several groups of Dutch citizens to the United States to inspect the Vermont property.

At some point during the course of Marriner's relationship with Kamerling, they decided that Marriner would give Kamerling four blank, undated checks signed by Marriner. The checks were drawn on an account of Marriner's at the Chase Manhattan Bank in New York. Marriner testified that he gave these checks to Kamerling to provide Kamerling with "credibility" in promoting the Vermont real

2

estate venture. According to Marriner, the only understanding that he and Kamerling had regarding the actual use of the checks was that Kamerling would obtain Marriner's approval before negotiating a check. Marriner testified that there was no written document memorializing their agreement.[2]

In December of 1981, Marriner closed the Chase Manhattan Bank account upon which the checks had been drawn. His relationship with Kamerling had ended prior to the closure of the bank account.[3]

The record in this case contains some of the pleadings and documents filed in or generated by the Belgian court proceedings. As best that can be determined from these, Kamerling had borrowed a substantial sum of money from Verstichele in 1991. In 1993, Kamerling and Verstichele signed an agreement whereby, as security for the loan, Kamerling transferred to Verstichele one of the Marriner checks, that check having been filled out payable to Kamerling in the sum of 435,000.00 Dutch florins. This check is undated but the copy of it in the record indicates that an attempt to negotiate it occurred in February of 1995.[4] The bank refused payment because the account had been closed years before.

Verstichele sued both Kamerling and Marriner in the Belgian court, the claim against Marriner being based on the "security" given Verstichele by Kamerling in the form of the Marriner check. Inexplicably, the Belgian proceedings took several years to finalize, the final judgment having been rendered on June 28, 2000. The record

---

[2] Marriner was the only person testifying in these proceedings, having testified live at the hearing as well as having his pre-hearing deposition introduced into evidence.

[3] Marriner testified that as some point prior to the closing of the bank account, two of the four checks given Kamerling had been negotiated and cashed. Marriner could not recall when these checks were cashed and for what purpose. He assumes that he must have given Kamerling his prior approval before these checks had been negotiated.

[4] Another of the Marriner checks was filled out (presumably by Kamerling) payable to Kamerling dated March 1, 1995, in the sum of 300,000.00 U.S. dollars. However, it does not appear that this check was transferred to Verstichele, nor has its collection been pursued, at least not in the proceedings under consideration here.

contains a document converting the amount of the judgment from Dutch florins into U. S. dollars. The principal amount of the judgment is $210,140.50, together with legal interest thereon from January 4, 1994 to August 31, 1996 at the rate of 8% per annum, and thereafter at the rate of 7% per annum, until paid.

The record also shows that on January 30, 1997, service of process was effected on Marriner by the United States Marshall's office.[4]

As we have indicated, Marriner was the only person to testify. Other than the Verstichele petition, the record is bare of any testimony, statement, affidavit, deposition or any other expressions from either Kamerling or Verstichele. It is Marriner's undisputed testimony that he had only been to Belgium once, that being in 1964 or 1965; that he never has done business in Belgium; that he has never owned an interest in any property or business operating in Belgium; and that whatever relationship he had had with Kamerling, it came to an end at some time prior to December of 1981, when the Chase Manhattan Bank account was closed.

**LAW AND DISCUSSION**

### THE LAW TO BE APPLIED IN DETERMINING JURISDICTION

Neither party has favored this court or the trial court with the law of Belgium setting forth the legal requisites in that country to establish personal jurisdiction. In presenting oral arguments to the Louisiana trial court, counsel for Verstichele conceded that the court could apply the law of Louisiana in determining whether the Belgian Court had personal jurisdiction over Marriner.

Louisiana law provides that where the jurisdictional law of a foreign state may

---

[4] The record is not clear why legal interest began to run against Marriner from July 4, 1994, given that service was not effected upon him until January 30, 1997. Apparently, the beginning of the running of legal interest was somehow tied to the date when Kamerling transferred to Verstichele any claims Kamerling might have had against Marriner.

4

be applicable in determining the jurisdiction of a court in such foreign state, and that law is not presented to the court by a party, the court may presume that the law of Louisiana is applicable.

> The law utilized to determine whether the foreign court had jurisdiction is the law of the forum state rendering the original judgment. However, where a party contends that the law of the foreign state applies but does not introduce or demonstrate what the law of that state is with respect to the relevant issued, it is presumed that the law of the foreign state on the questioned point is the same as the existing law of Louisiana.

*State v. Konkle,* 03-512, p. 5 (La.App. 3 Cir. 11/12/03), 865 So2d. 808, 813, *writ denied,* 866 So.2d 818 (La. 2/20/04), *citing Holden v. Holden,* 374 So.2d 749 (La.App. 3 Cir. 1979). Accordingly, we will apply Louisiana law in determining whether the Belgian court had personal jurisdiction over Marriner.

**JURISDICTION AS A DEFENSE**

Louisiana law provides as a valid defense to an action to recognize a foreign judgment, the lack of jurisdiction of the foreign court to render such a judgment. A foreign court, therefore, must have had both substantive jurisdiction and personal jurisdiction.

Here, the trial court found that the Belgian court had substantive jurisdiction. That holding by the trial court has not been appealed. Therefore, it is final and will not be considered by this court.

Although Verstichele has appealed the trial court's finding that the Belgian court lacked *in personam* jurisdiction of Marriner, Verstichele does not dispute that lack of personal jurisdiction can be a valid defense to making a foreign judgment executory in Louisiana. The law plainly provides that for a foreign judgment to be recognized and made executory in Louisiana, the foreign court rendering such

5

judgment must have had personal jurisdiction over the judgment debtor. *See Konkle*, 865 So.2d 808; *Schultz v. Doyle*, 00-0926 (La. 1/17/01), 776 So.2d 1158; *Holiday Hospitality Franchising, Inc. v. Grant*, 38,103 (La.App. 2 Cir. 1/28/04), 865 So.2d 257, *writ denied*, 04-0501 (La. 4/8/04), 870 So.2d 275.

Although Verstichele does not dispute this principal of law, he contends that one attacking a foreign judgment on the basis of the lack of personal jurisdiction has the burden of proving this and that Marriner has failed to satisfy this burden.

**PERSONAL JURISDICTION**

There is no evidence that Marriner purposefully directed his own activities at residents of Belgium to the extent necessary to subject himself to the jurisdiction of the courts of that country. As stated above, other than visiting Belgium in the year 1964 or 1965, Marriner had made no personal contacts in Belgium which would subject him to the jurisdiction of the courts of that country. Clearly, Marriner's own activities in Belgium failed to satisfy the minimum contact aspect of the due process clause.

> When a state seeks to assert specific jurisdiction over a defendant, the minimum contracts prong of the due process analysis is satisfied 'if the defendant has purposefully directed his activities at residents of the forum.' *de Reyes v. Marine Management and Consulting, Ltd.,* 586 So.2d 103, 106 (La. 1991) citing *Keeton v. Hustler Magazine, Inc.* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 7980 (1984). According to the *de Reyes* decision, this rule 'ensures that [the defendant] will not be haled into a jurisdiction solely as a result of a random, fortuitous or attenuated contact, ro by the unilateral activity of another party or a third person.' 586 So.2d at 106. However, a non-resident defendant is considered to have minimum contacts with the forum state for purposes of general jurisdiction only if it engages in 'continuous and systematic activities' in the forum. *Id.* at 108. Thus, this court has held that 'much more substantial contacts with the forum state are required to establish general, as opposed to specific, jurisdiction.' *Bosarge v. Master Mike, Inc.* 95-0986, p. 3 (La.App. 4 Cir. 1/31/96), 669 So.2d 510, 512, *writ denied*, 95-0397 (La. 3/22/96), 669 So.2d 1214. In fact, the contracts must be 'so substantial and of such a nature as to justify suit against it

on causes of action arising from dealings entirely distinct from those activities.' *International Shoe Co.* 326 U.S. at 318, 66 S.Ct. at 159 90 L.Ed. at 95.

*Tulane Industrial Laundry, Inc. v. Quality Lube & Oil, Inc.* 00-0610, p. 3 (La.App. 4 Cir. 1/24/01), 779 So.2d 99, 101-02. *See also A.O. Smith Corp. v. American Alternative Ins. Corp.* 00-2485 (La.App. 4 Cir. 12/27/00), 778 So.2d 615, *writ denied,* 787 So.2d 321 (La. 3/23/01).

Indeed, Verstichele does not contest the trial court's ruling on the basis of Marriner's own personal contacts in Belgium, but rather contends that the jurisdiction over Marriner was established through Marriner's agent, Kamerling. The focus of Verstichele's appeal is that Marriner had sufficiently clothed Kamerling with the authority to be Marriner's agent in Belgium and thereby subjected Marriner to the jurisdiction of the Belgian courts. In essence, Verstichele argues that when Marriner gave Kamerling the signed, blank checks to be used to promote Marriner's interests, Marriner had made Kamerling his agent. Verstichele adds that Marriner imposed no restrictions on when the checks could be used by Kamerling or where the checks could be used. Verstichele asserts that by not prohibiting Kamerling from using the checks in Belgium, Marriner authorized it. As to Marriner's testimony that Kamerling was instructed not to negotiate a check without first obtaining Marriner's permission, Verstichele asserts that this restriction was not known to Verstichele and, therefore, was not binding on him.

Beyond Kamerling's being given the authority to promote land sales in Vermont in the late 1970's or early 1980's, there is no proof of any express agency relationship between Marriner and Kamerling. There was no actual authority given Kamerling to use a check in a Belgian transaction, much less one involving a loan

7

in the mid 1990's from Verstichele to Kamerling. There was no manifestation from Marriner to Kamerling that Kamerling had such authority. Verstichele argues, however, that based on his dealings with Kamerling there was *apparent* authority for Kamerling to bind Marriner.

Verstichele is correct that as a general rule, the party attacking the validity of a foreign judgment on the basis of the lack of jurisdiction, has the burden of proving the absence of such jurisdiction. However, when a party pegs personal jurisdiction on the basis of an *apparent* agency relationship, the burden of proving such a perceived agency relationship is on the party attempting to bind the principal.

> An agency relationship is never presumed; it must be clearly established. *Fleet Finance, Inc. v. Loan Arranger, Inc.*, 604 So.2d 656, 658, (La.App. 1st Cir. 1992); *Duplessis Cadillac, Inc. v. Creative Credit Services, Inc.,* 564 So.2d at 338. The burden of proving apparent authority is on the party seeking to bind the principal. A third party may not blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purportedly granted by the principal permits the proposed act by the agent. *Desormeaux v. Lalonde,* 578 So.2d 226, 230 (La.App. 3rd Cir.), *writs denied*, 581 So.2d 705 and 706 (La.1991); *Duplessis Cadillac, Inc., v. Creative Credit Services, Inc.*, 564 So.2d at 339. One must look from the viewpoint of the third party to determine whether an apparent agency has been created. *AAA Tire & Export , Inc. v. Big Chief Truck Lines, Inc.*, 385 So.2d 426, 429 (La.App. 1st Cir. 1980). A trial court's determination as to whether an apparent agency exists will not be reversed in the absence of manifest error. *See Boulos v. Morrison*, 503 So.2d at 3.

*Cartinez v. Reliable Amusement Co., Inc.,* 99-333, p. 8 (La.App. 3 Cir. 11/3/99), 746 So.2d 246, 251*, writ denied*, 754 So. 2d 235 (La. 2/4/00)*, quoting with favor from Barrilleaux v. Franklin Foundation Hospital,* 683 So.2d 348, (La.App. 1 Cir. 1996), writ denied, 686 So.2d 864 (La. 1/24/97). *See also McManus v. Southern United Fire Ins., et al,* 00-1456 (La.App. 3 Cir. 3/21/01), 801 So.2d 392.

As already stated, the evidence of the existence of an actual agency relationship

8

between Kamerling and Marriner in the mid 1990's is non-existent. For some reason, Kamerling held on to the check in question for many years after his relationship with Marriner had ended. The undisputed evidence is that the connection between Marriner and Kamerling had ended at some time prior to the closing of the bank account in 1981. The property venture in Vermont, the sole purpose for issuance of the checks, had ended prior to 1981 as well. There can be no question that by 1993, when Kamerling agreed to transfer to Verstichele his rights against Marriner, and in 1995 when there was an attempt to negotiate the check in question, Kamerling knew full well he was not acting under any imprimatur from Marriner. Inescapably, one would have to conclude just the opposite, *i.e.*, that Kamerling's actions were a blatant fraud against the interests of Marriner.

Nevertheless, in analyzing the possibility of an apparent agency relationship, we must view the issue from the perspective of the person allegedly relying on the agency. Here, that would be Verstichele. In this task, we are not favored with any testimony from Verstichele. His presence has been conspicuously absent in these proceedings. We must examine what evidence is available to us to determine if Verstichele could have legitimately believed that in 1993, or 1995, Kamerling was the Belgian agent of Marriner.

The record reflects the only indicia known to Verstichele of any sort of connection between Kamerling and Marriner, was the check which Kamerling had provided to Verstichele. It is assumed that Kamerling verbally explained to Verstichele why Kamerling possessed the check and how Marriner might fit into the picture. But the record is silent on what Kamerling may have told Verstichele. We are left, therefore, with the only evidence of an agency arrangement between Marriner

9

and Kamerling being the check in question and Kamerling's possession of it. We find the following factors to be important in determining whether Verstichele fulfilled his duty to find out if there were an apparent agency relationship between Marriner and Kamerling:

●The check in question, payable to "Mr. Kamerling Onno" in the sum of 435,000.00 Dutch florins, *is undated*, and there is no evidence of how Verstichele reacted to this potentially troubling oversight.

●There is no evidence that Verstichele made any inquiry to learn why Kamerling possessed this check and how he came into possession of it.

●Verstichele was presented with no written document spelling out any relationship between Kamerling and Marriner.

●There is no evidence that Verstichele attempted to contact Marriner to confirm that Kamerling was legitimately in possession of the check.

●There is no evidence that Verstichele contacted Chase Manhattan Bank to determine if the check could be negotiated. It is quite apparent that Verstichele made no such contact with the bank because if he had, he would have learned that the account upon which the check had been drawn had been closed for more than a decade.

It is plain that Verstichele did absolutely nothing to verify the so-called agency relationship. "A third party may not blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purportedly granted by the principal permits the purposed act by the agent." *Cartinez,* 746 So.2d at 246. The lack of evidence showing that Verstichele took any initiative to verify the validity of this most unusual use of the Marriner check might even suggest that Verstichele was

a knowing party to the scam perpetrated by Kamerling.  At the very least, it seems obvious that Verstichele chose to "blindly rely on the assertions" of Kamerling, whatever those assertions may have been. Marriner's own admitted imprudence in giving the blank, signed checks to Kamerling is not enough to give license to Kamerling to use the checks at any time in the future and for whatever reason Kamerling might choose.  Marriner may have been negligent, but his actions or inactions fall short of leading Verstichele to the reasonable belief that Kamerling was the agent of Marriner and had sufficient authority to subject Marriner to the jurisdiction of a court in Gent, Belgium.

For these reasons the judgment of the trial court is affirmed.  Costs of this appeal are assessed to the Plaintiff/Appellant, Verstichele.

AFFIRMED.

NUMBER 04-354

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

HUBERT VERSTICHELE

VERSUS

RICHARD A. MARRINER

AMY, J., concurring.

I concur in the majority's determination to affirm the granting of the no right of action. In support of his exception of no right of action, the defendant presented evidence indicating that although the relationship of principal/mandate may have existed at one point, that relationship ceased well before the checks were allegedly provided to the plaintiff. Furthermore, while the parties argue as to whether a mandate/apparent agency relationship existed, there is no indication that the Belgian court found personal jurisdiction present after finding such a relationship. There is no evidence in the record that Mr. Kammerling represented himself to the plaintiff to be the mandatary of the defendant or that there was reliance on such a representation. Rather, the Belgian judgment indicates only that the check was provided "as security for payment of the sum of money which the first defendant [Mr. Kammerling] had undertaken to pay." This finding relates to the actions of Mr. Kammerling, not those of the defendant. Accordingly, I find no merit in the argument that the Belgian court had personal jurisdiction over the defendant due to the presence of a relationship of representation. The record lacks evidence to support such a finding. Accordingly, I agree that the exception of no right of action was appropriately granted.