li PEATROSS, J.
This appeal arises from a judgment against Defendants, Central Oil & Supply Corporation (“Central Oil”), Robert E. Powell and C-Store Services, Inc. (“C-Store”), in favor of Plaintiff, Caldwell Wholesale Company, Inc. (“Caldwell”), in the amount of $319,008.08, constituting inventory advanced to Defendant, C-Store, a chain of convenience stores which were later given over to Central Oil pursuant to a dation en paiement. Central Oil has appealed.[1] For the reasons stated herein, we reverse.
*686 FACTS AND PROCEDURAL HISTORY
The impetus of this action was the failure of a chain of convenience stores owned by C-Store and C-Store’s resulting inability to pay for inventory which was advanced to it by Caldwell. Robert Powell was the principal shareholder and president of C-Store which began owning and operating convenience stores in the North Louisiana area in 1986. By 1990, C-Store operated 19 stores. Hardeman Cordell was the president and principal shareholder of Central Oh which supplied C-Store with petroleum products.
At each store location, C-Store owned the in-store grocery inventory and generally leased the land, building and fixtures from other entities or individuals. The land, building and fixtures associated with five of the seven stores involved in this litigation were leased from Mr. Powell and Mr. Cordell.
By December 1990, C-Store was indebted to Central Oil for approximately $750,000 in fuel and to Caldwell for approximately $250,000 in grocery supplies. Mr. Powell made arrangements with Kenneth Caldwell, president of Caldwell, to continue to pay for Caldwell’s deliveries on a weekly basis. As agreed between Mr. Powell and Mr. Caldwell, the payments, although equal to current shipments, | ¡would be applied first to C-Store’s oldest invoices from Caldwell. Mr. Cordell agreed, on behalf of Central Oil, to continue supplying C-Store with fuel, provided the current supplies were paid for as they were received; and Cental Oil was given a security interest in C-Store’s inventory and supervision of cash flow and the operation of seven of C-Store’s locations (hereinafter referred to as “Agreement”). A UCC-1 financing statement was recorded with the Louisiana Secretary of State on January 22, 1991, to reflect the Agreement.
In conjunction with the Agreement to supervise the seven stores, Central Oil opened special bank accounts for the purpose of managing the finances of the stores. Under the Agreement, Central Oil used the income in these accounts for payroll, bills and invoices for the seven supervised C-Store locations. Mr. Powell, however, requested that C-Store retain control over the payment of invoices to Caldwell, to which Central Oil agreed.
Central Oil asserts that it did not receive any profit for running the seven stores and paid itself only for current fuel supplied to those locations. No attempts were made by Central Oil to collect the outstanding debt of $750,000. Other than Central Oil’s supervision, the seven stores were run under C-Store’s licenses and registered trade name, Kwik Trip. This arrangement continued through May 1991.
During this time, per his request, Mr. Powell received the invoices from Caldwell which were based on current shipments. Mr. Powell would compute the portion of the invoices attributable to the seven supervised stores and would forward a breakdown of those amounts to Central Oil. Central Oil would then send C-Store a check in that amount, drawn from the operations account of the seven supervised locations, which C-Store would in turn deposit into its corporate account. The Agreement provided that C-Store would then pay Caldwell for the current week’s supplies. As evidenced by the record, this is not what occurred.
[¡¡Mr. Powell and C-Store’s comptroller, Annette Hamm, testified that, toward the end of 1990, although it was still the custom to print checks for payment of invoices as the invoices came in, the checks themselves were often not released due to lack of funds. Instead, Mr. Powell would hold the check with the invoice until there were sufficient funds to cover the check. As C-Store would receive money from Central Oil to cover the Caldwell inventory of the seven supervised stores, C-Store would release previously printed checks in amounts close to the amount received from Central Oil. Having been printed prior to *687 Central Oil’s supervision, however, the C-Store checks were designated as payment for invoices dated before Central Oil’s supervision and for stores not under that supervision.
Caldwell applied these payments to C-Store’s older debts on all of C-Store’s locations. None of the sums paid by C-Store to Caldwell during the February to May 1991 time period were applied to invoices for shipments made during that time period to the seven stores supervised by Central Oil. Instead, they were applied to invoices owed by the seven supervised stores which were incurred before the supervision took place; invoices owed by two locations which had been transferred to Diamond Shamrock in November 1990; and invoices owed by stores still operated by C-Store, but not under Central Oil’s supervision. Of the $252,946 paid by Central Oil to C-Store, specifically for the payment of current Caldwell invoices to the seven supervised stores, $163,173 was applied toward pre-February 1991 invoices at the seven stores and $89,773 was applied to pre-February'1991 invoices of non-supervised stores.[2] None of the sums paid by C-Store to Caldwell from February to May 1991 was applied toward current invoices for the seven supervised stores.
|4When it became obvious that C-Store’s indebtedness to Central Oil ($750,000) would not be paid, the leases, fixtures and inventory at the seven locations subject to the security interest in favor of Central Oil were transferred to Central Oil pursuant to a dation en paiement dated May 31, 1991. Central Oil assumed operation of the seven stores at the beginning of June 1991, changed the names of the stores to “Harde’ Mart” and notified Caldwell that the stores would no longer be using Caldwell as their grocery supplier. After some discussion between Mr. Cordell and Mr. Caldwell, Mr. Cordell agreed to allow- the stores to continue purchasing from Caldwell. New accounts were established in Central Oil’s name; and, thereafter, all invoices were sent to Central Oil, which paid Caldwell for current shipments on a current basis. These new payments were not allocated by Caldwell to any of C-Store’s outstanding debt.
In December 1991, Mr. Cordell notified Mr. Caldwell that Central Oil no longer wished to use Caldwell as its supplier. At this. point, Mr. Caldwell demanded payment for sums he claimed were owed to Caldwell by Central Oil for inventory provided to C-Store during the period from February to May 1991. Caldwell then sued Central Oil, Mr. Powell and C-Store claiming damages under the theories of unfair trade practices and unjust enrichment. In January 1992, Caldwell also filed suit against Mr. Powell, C-Store, Mr.' Cor-dell and' his wife, Susan Cordell, under the Bulk Sales Law statutes for a transaction involving real estate and fixtures at some of the Kwik Trip locations. The cases were consolidated and a bench trial was held beginning September 11, 1997, and continued on January 6-8, 1998, and January 13-14,1998.
At the close of Caldwell’s case, the trial court dismissed the unfair trade practice claims against Central Oil pursuant to La. C.C. art. 1672(B), but found Central Oil liable to Caldwell in the amount of $319,-008.08, failing, however, to specify the grounds upon which the judgment was based. Mr. and Mrs. Cordell [fiwere dismissed from the suit, but the claim against Mr. Powell and C-Store was not addressed.
Central Oil filed a motion for suspensive appeal which was dismissed without prejudice and remanded because the judgment of the trial court was only partial. The trial court then confirmed a default judgment against Mr. Powell and C-Store, for failure to file answers, holding them liable with Central Oil for the sum of $319,-008.08, subject to a credit in favor of Mr. *688 Powell and C-Store for the sums paid earlier on the account. Central Oil again moved for a suspensive appeal, which was granted. Neither Mr. Powell nor C-Store has appealed the judgment.

DISCUSSION

Unjust Enrichment

Caldwell complained of unjust enrichment under two circumstances, its continued shipment of goods to the seven supervised locations and C-Store’s grant of 'a security interest and subsequent dation en paiement to Central Oil. Central Oil asserts as its first assignment of error that the trial court committed legal error in finding in favor of Caldwell under the theory of unjust enrichment. We agree.
Unjust enrichment is founded on the equitable principle that no one should be enriched at the expense of another. Although it is a remedy in equity, courts are discouraged from using the principle to remedy every unjust displacement of wealth. In order to award such a remedy, therefore, the following elements must each be proven: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of “justification” or “cause” for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff. Baker v. Maclay Properties Co., 94-1529 (La.1/17/95), 648 So.2d 888; Edmonston v. A-Second Mortgage Co. of Slidell, Inc., 289 So.2d 116 (La.1974); Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967). Caldwell has the burden of proving each element of unjust enrichment by a preponderance of the evidence. Harper v. Kennedy, 561 So.2d 830 (La.App. 2d Cir.1990).

(1) Enrichment

Central Oil denies Caldwell’s assertion that it was enriched by Caldwell’s continued supply of groceries to the seven supervised locations. Caldwell argues that Central Oil sold those supplies for profit and benefit. This record does not support such an assertion. Although Central Oil did manage the cash flow of the seven supervised stores, it did not recognize a profit.
The evidence supports Mr. Cordell’s testimony that the money earned during the supervisory period was expended on payroll, insurance and current fuel and other supply invoices, including Caldwell’s. Central Oil turned over any proceeds earned from the seven stores, necessary to pay the current Caldwell invoices, to C~ Store. Mr. Cordell testified that, in fact, he was never able to recover the $750,000 that C-Store owed for past fuel supplied by Central Oil. The value of the dation did not equal the sum of the debt. Instead, those debts were eventually written off the Central Oil ledgers as a loss.
In support of its position, Central Oil cites Newt Brown, Contractor, Inc. v. Michael Builders, 569 So.2d 288 (La.App. 2d Cir.1990), writ denied, 572 So.2d 91 (La.1991). We find this case to be persuasive. In Newt Brown, supra, the property owner paid the price of the contract to the general contractor. The general contractor, however, failed to pay the subcontractor, who sued the property owner for unjust enrichment. The court found that the owner paid an amount equal to the value of that which it received and was, therefore, not unjustly enriched. We find the same to be true in the case sub judice. The evidence shows that for every Caldwell invoice received by Central Oil from C-Store for the seven ^supervised stores from February to May 1991, Central Oil paid the amount of the invoices to C-Store.

(2) Impoverishment

Caldwell was certainly not impoverished by this arrangement. If anything, it bene-fitted. The only funds which C-Store used to pay Caldwell invoices, albeit old invoices, was that money given to it by Central Oil. The record does not reflect that *689 C-Store used any of the money earned through the continued operation of the other unsupervised stores or from the sale of the two stores to Diamond Shamrock to pay Caldwell invoices.
Further, Mr. Caldwell testified that the overall debt already owed to Caldwell by C-Store prior to February 1991 remained the same and that, had C-Store simply shut down in February 1991, Caldwell would have been in the same position as it was in May 1991. Any impoverishment Caldwell suffered was occasioned prior to Central Oil’s supervision of the seven stores.

(S) Connection between enrichment and impoverishment

As stated above, we find no enrichment on the part of Central Oil and there is no causal connection between Caldwell’s alleged impoverishment and the actions of Central Oil.

(Jf) No Justification or cause

Although we fail to find the first three elements necessary for unjust enrichment, making any further discussion moot, we will address this fourth element. Not every unjust enrichment warrants usage of equity. Courts may resort to equity only in cases of unjust enrichment for which there is no justification in law or contract. In other words, an enrichment is justified if it is the result of, or finds its explanation in, the terms of a valid juridical act between the impoverishee and the enrichee or between a third party and the enrichee. Edmonston v. A-Second Mortgage, supra; Harper, supra. Enrichment has legal justification ¡¿when it flows from the proper application of a rule of law or contractual provision; it must not “perpetuate a fraud on the law.” Harper, supra, and cases cited therein.
Central Oil was certainly justified in, and had cause for, taking a security interest in, and subsequently a dation of, the seven supervised locations because of the considerable debt which C-Store owed to Cental Oil. The security interest was simply to ensure that Central Oil was a secured creditor. We conclude, therefore, that Central Oil was justified in its actions. The fact that Caldwell remained an unsecured creditor, thus subordinate to Central Oil, is perhaps a bad business decision, but does not rise to the level of unjust enrichment. Furthermore, under the fifth element of unjust enrichment, Caldwell had a separate legal remedy in that it could have questioned the validity of the security interests.

Expansion of Pleadings

Since the trial court did not specify what theory of law under which it found Central Oil liable, Central Oil has, out of caution, stated and defended several other theories of recovery, necessitating further discussion. Central Oil has raised as its second assignment of error that, should Caldwell argue that the theory under which the trial court found Central Oil liable is some form of contract or open account, then the trial court has erred in expanding the pleadings to allow for such an action or recovery thereunder.
The general rule is that pleadings may be enlarged by evidence adduced without objection when such evidence is not pertinent to any other issue raised by the pleadings and, hence, would have been excluded if objected to timely. La. C.C.P. art. 1154; Webster v. Rushing, 316 So.2d 111 (La.1975); Cooper v. Borden, Inc., 30,-292 (La.App.2d Cir.2/25/98), 709 So.2d 878; Shrader v. Life General Security Insurance Co., 588 So.2d 1309 (La.App. 2d Cir. 1991).
| ¡/There is no evidence in the record to either support a finding of contractual obligation between Central Oil and Caldwell or to expand the pleadings for such an action. There is no evidence to support privity of contract between Central Oil and Caldwell.[3] The evidence adduced at trial *690 shows that no one at Caldwell ever had any contact with anyone at Central Oil during the period of supervision. Contact between those parties did not occur until May 1991 when Central Oil actually took over operation of the seven stores.
Further, there is no evidence that C-Store and Central Oil had any agreement regarding an assumption of C-Store’s past debts. To be enforceable by an obligee, in this case, Caldwell, a contract between an obligor, C-Store, and a third party, Central Oil, must be in writing for the third party to assume the debts of the obligor. La. C.C. art. 1821.[4] No such writing is evidenced by the record. Any claims of contract, therefore, are without merit.
In addition, we find no evidence of an open account between Central Oil and Caldwell for the pre-existing debts or evidence sufficient to expand the pleadings for such an action. All Caldwell invoices were addressed and sent to C-Store, not Central Oil. C-Store incurred those debts, be it on open account or otherwise; and it is the obligor of those debts. La. C.C. art. 1756.
Contrary to the factual and legal finding of the trial court, Central Oil did not take ownership in the inventory of the seven supervised stores until May 1991. Notwithstanding Mr Powell’s testimony that he signed the dation in January 1991, |inalbeit contrary to his own later testimony and that of other witnesses,[5] his signature alone does not make it a valid transfer. A dation requires consent of all parties. La. C.C. arts. 2655, 2656; Frue-hauf Trailer Division, Fruehauf Corp. v. Toups, 243 So.2d 88 (La.App. 1st Cir.1970). In order to maintain a plea of estoppel based on the doctrine of accord and satisfaction, there must be a tender by the debtor, and acceptance of the tender by the creditor. Pontchartrain Park Homes, Inc. v. Sewerage and Water Board of New Orleans, 246 La. 893, 168 So.2d 595 (1964). The evidence shows that Central Oil did not accept the dation prior to May 1991, regardless of Mr. Powell’s supposed intent for an earlier exchange.

Imputation of Payments

As a final issue, we address Caldwell’s imputation of C-Store’s payments between February and May 1991 to previously incurred debts. Although a creditor may impute payments to a certain debt, which may be binding as between the parties, such imputation will not necessarily bind third parties who are defrauded by the imputation. La. C.C.P. arts. 2163, 2165, 2166; Romero & Sons Lumber Co. v. Babineaux, 151 So.2d 714 (La.App. 3d Cir. 1963). This is particularly true where the creditor had knowledge of the source of funds and an imputation is made in agreement with the debtor which would constitute a fraud on a third party. Grand Lodge, Benevolent Knights of America v. Murphy Construction Co., 152 La. 123, 92 So. 757 (1922); Marks v. Deutsch Construction Co., 258 So.2d 676 (La.App. 4th Cir.1972); Duffy v. Roman, 209 So.2d 502 (La.App. 4th Cir.1968).
On this record, we find sufficient evidence that not only was Central Oil de *691 frauded by the imputation of payments to older debts, but Caldwell was aware of luthe source of the money C-Store was using to pay its bills. Sonny Wren, an upper management employee of C-Store, testified that he remembered telling Mr. Caldwell that Mr. Cordell and Central Oil were taking care of C-Store’s debts. Mr. Wren also later testified that he had never had a conversation with Mr. Cordell or anyone with Central Oil regarding the payment of C-Store’s debts.
In summary, we find that at no time did Central Oil assume C-Store’s prior debts to Caldwell or become liable for those debts under any theory of law or equity.

DECREE

For the foregoing reasons, we reverse that portion of the judgment of the trial court finding Defendant, Central Oil & Supply Corporation, liable to Plaintiff, Caldwell Wholesale Company, Inc., for any debts accrued by or on behalf of Defendant, C-Store Services, Inc., namely, the sum of $319,008.08. All costs are assessed to Plaintiff, Caldwell Wholesale Company, Inc.
REVERSED AND RENDERED.

. The judgment against Mr. Powell and C-Store was by confirmation of default, which has not been appealed. Mr. Powell was also given credits of $18,052.47 and $14,652.68 for sums he paid to Caldwell on May 24, 1991, and May 31, 1991, respectively.

. The parties testified that, for the sake of simplicity, Central Oil’s supervision over the seven stores became effective February 1, 1991.

. Moreover, we note that Caldwell has negated any claim in contract by pleading unjust *690 enrichment since that remedy is only available where there is no contract between the parties or any other form of relief.

. In its brief, Caldwell cites La. C.C. art. 1846, and related cases, for the proposition that a contract can be proven by a witness and other corroborating evidence, alluding that a written contract is not necessary. In quoting the codal article in its brief, however, Caldwell neglects to include the part of the article that states, “When a writing is not required by law....” La. C.C. art. 1846, therefore, is not applicable to the case sub judice since La.C.C. art. 1821 requires that the assumption of an obligor’s debts by a third party be in writing.

. Mr. Powell testified that, when he met with Don Kneipp in Arcadia, Louisiana, in January 1991, he signed the dation. When he was later asked whether any documents were signed at the January 1991 meeting in Arcadia, however, he replied "no.” Mr. Kneipp also testified that no documents were signed at that meeting.