771 So.2d 311 (2000)
Jack W. CLAMPIT, Plaintiff-Appellee,
v.
INTERSTATE DODGE, INC., Defendant-Appellant.
No. 34,125-CA.
Court of Appeal of Louisiana, Second Circuit.
November 15, 2000.
*312 M. Randall Donald, Monroe, Counsel for Appellant.
Donald L. Kneipp, Monroe, Counsel for Appellee.
Before STEWART, KOSTELKA, DREW, JJ.
DREW, J.
In this action seeking specific performance of what Jack Clampit alleges is a valid sale of a new 1999 Dodge Ram Quad-Cab 4×4 pickup truck, Interstate Dodge appeals a judgment ordering them to release the truck to Mr. Clampit upon payment of $20,000, which is eight thousand dollars below the invoice price. We reverse in part and affirm in part.

FACTS
On August 31, 1998, Jack Clampit and his wife Debbie Clampit went to Interstate Dodge in Monroe after having compared vehicles at other dealerships. The Clampits were interested in purchasing a new truck for Debbie to use to pull a trailer for their daughter's barrel racing. After walking around the Interstate Dodge lot, the Clampits found two trucks that would suit their purpose, one a black truck, the other a white pickup that "had seemingly everything [they] wanted on it." This white truck is the subject of this litigation. Mr. Clampit noticed that the price listed on an addendum sticker on the truck was $22,250.00.
On the truck was a "Maroney" sticker placed on the truck by Dodge. The Maroney Sticker, which was affixed to the vehicle by the manufacturer, listed the equipment and the manufacturer's suggested retail price. Next to the Maroney sticker was an addendum sticker which listed the *313 adjusted market value price. The addendum, listing a price of $22,250, had been mistakenly placed on the truck by a porter employed by the dealership. The stock number on the addendum sticker was the stock number for a Dodge Intrepid car.
Since no one approached the Clampits while they were looking at the trucks, they went inside the dealership, where they were greeted by Daniel Billiot, a salesman at Interstate Dodge who gave them his business card. After telling Billiot they were interested in two trucks, the trio went outside. As they approached the 1999 Ram Quad-Cab, Mr. Clampit told Billiot that they had looked at a GMC three-quarter ton pickup in the $26,000 price range and that Billiot needed to be in that range to compete. When they reached the truck, Billiot responded that the Clampits were "in luck" because they could buy the truck for $22,000.00. Mr. Clampit told Billiot that he wanted to test drive the truck and that he had some questions about it.
Billiot asked the Clampits if they were going to trade-in a vehicle. When the Clampits answered that there would be no trade-in and that it was a cash deal, Billiot told them that for a cash deal he could cut $2,000 off the price without his sales manager's approval and sell it for $20,000.00. As they left the lot on the test drive, Billiot said that he was one vehicle away from his quota and that he would like to sell them the truck to make his monthly quota. Billiot informed the Clampits about the truck's features during the drive. When Mrs. Clampit inquired about the truck's price, Billiot said that for $20,000 cash, they could drive the truck home that day. Shortly thereafter, Mr. Clampit told Billiot that they liked the truck and for $20,000 he had just sold a truck. According to Mr. Clampit, Billiot responded, "[W]ell, you've just bought it because that's the price, cash money today, you take it home." Billiot added that he had made his quota for the month.
The Clampits and Billiot returned to Interstate Dodge. Billiot told Mr. Clampit to pull up to the front door so they could go inside and do the paperwork and get the truck ready. Billiot stated that he needed to complete all the paperwork, and that in 30-45 minutes the truck would be ready. Billiot filled out what is known in the industry as a "Four-Square" document. The four-square was titled "OFFER TO PURCHASE." Mr. Clampit instructed Billiot to place the truck's title under the name of ETC Leasing. Billiot told Mr. Clampit that in order for there to be a valid deal, Mr. Clampit needed to sign the four-square to show his agreement to the price and tender a check for $20,000.00. Mr. Clampit signed the foursquare and gave Billiot a check for $20,000 drawn on the account of Triple C Horse Farm. Billiot left with the check and foursquare, telling the Clampits that he was going to prepare their paperwork.
Billiot brought the four-square and check to Paul Bozant, Interstate Dodge's General Sales Manager, to determine if the Clampits' offer would be accepted. When Bozant looked at the four-square, he immediately knew that the stock number on the four-square, which had been copied from the addendum sticker, was incorrect because it began with the number 58, which is used for Intrepids, instead of the 76 used for Ram trucks.
Billiot returned five minutes later to inform the Clampits that their offer had been rejected and to explain the mistake. Mr. Clampit retorted that as far as he was concerned, they had a deal. Sales Manager Bozant told the Clampits that he would not accept their offer and that there had been a mistake. He attempted to return the check to Mr. Clampit, who refused to take it. When Mr. Clampit told Bozant that Billiot had quoted him the price several times, Bozant responded that their salesmen were not permitted to quote prices.
Billiot never told the Clampits that he had to give the four-square to his manager. *314 Mr. Clampit was under the impression that the four-square would be used to prepare the title. Mrs. Clampit testified that Billiot told them that the four-square represented the Clampits' agreement to the terms on the document about the truck. She believed that the reason Billiot left with the four-square was to get the truck ready.
Mr. Clampit agreed that there were two stickers on the truck. Regarding the Maroney sticker, he testified that he recalled the features more than the price on it. He looked at the price on the Maroney sticker after learning of the addendum error. The addendum sticker was next to the Maroney sticker. Mrs. Clampit testified that she never read either sticker; however, she glanced at the addendum sticker when Billiot first said $22,000 was the truck's price.
On September 4, 1998, Donald Kneipp wrote a letter to Interstate Dodge on behalf of the Clampits demanding that it comply with the terms of the contract. On October 2, 1998, Mr. Clampit sued Interstate Dodge seeking specific performance of the contract to purchase the truck for $20,000.00. In its answer, Interstate Dodge sought sanctions for what it described as a frivolous lawsuit.
The trial court ruled in favor of Mr. Clampit, finding that a contract existed to sell the truck for $20,000, and ordered Interstate Dodge to release the truck to Mr. Clampit subject to the payment of $20,000.00. The claim for sanctions and attorney fees was denied. Interstate Dodge motioned for a new trial, which was denied by the trial court.
Interstate Dodge suspensively appeals.

DISCUSSION
Interstate Dodge contends that the trial court erred in finding that the parties had entered into a contract. A sale is a contract whereby a person transfers ownership of a thing to another for a price in money; the thing, the price, and the consent of the parties are requirements for the perfection of a sale. La. C.C. art. 2439.
Bozant testified that only he, the dealership owner, the new car manager and the used car manager can accept an offer to purchase a vehicle. A salesman is not allowed to accept an offer. This is because a salesman does not have access to the actual cost of a vehicle; their price information comes from the sticker attached to the vehicle. Bozant related that the cost of the truck to Interstate Dodge was $28,125, which is well above the amount offered by the Clampits.
When the customer makes an offer, the salesman is instructed to bring Bozant or another sales manager the four-square so he can accept the offer or propose a counter-offer. The sales manager signs the four-square if the offer to purchase is accepted. After an offer is accepted, the salesman fills out an odometer statement, the vehicle registration and a buyer's order form. The buyer's order form, which is signed by the customer, is completed with information about taxes as well as title and registration fees.
Bozant explained that the four-square is a standard form used in every sale to negotiate with the customer. In what is apparently a sales technique, the salesman gets the customer to sign the four-square as a symbol of the customer's commitment to negotiate. Billiot was also trained to attempt to get more than just a signature on the four-square, such as earnest money or even a watch, to show the customer's commitment to do business.
Billiot, who is now employed by a different Monroe auto dealer, testified in his deposition that he was required to submit offers to management for their approval. He could not accept offers because he did not know how much the dealer paid for the vehicle as he did not have access to that information. Billiot related that he worked with the customers to construct an offer to submit to management. Billiot *315 added that part of his job was to see how much cash he could get a customer to put down because it would increase how much money he made.
The testimony is clear that Billiot could not accept an offer to purchase. Any offer he received was to be submitted to management for approval. In fact, the foursquare was titled "OFFER TO PURCHASE." The Clampits' offer to purchase the truck for $20,000 was rejected by Interstate Dodge. No sale was perfected because Interstate Dodge did not consent to a sale.
The Clampits counter that Billiot had apparent authority to bind Interstate Dodge, essentially arguing that a contract had already been entered into by Billiot as Interstate Dodge's agent before Bozant ever rejected the offer. We disagree.
Apparent authority is an estoppel principle which operates in favor of third persons seeking to bind a principal for unauthorized acts of an agent. When the apparent scope of an agent's authority, the indicia of authority, is relied upon by innocent third parties to their detriment, the principal is liable. Independent Fire Ins. Co. v. Able Moving and Storage Co., Inc., 94-1982 (La.2/20/95), 650 So.2d 750. For the third party to hold the principal liable under the doctrine of apparent authority, it must show a reliance on the conduct of the principal and a change of position on its part such that it would be unjust to allow the principal to deny the agency. J. Caldarera & Co., Inc. v. Louisiana Stadium & Exposition Dist., 99-787 (La.App. 5th Cir.12/15/99), 750 So.2d 284, writ denied, XXXX-XXXX (La.3/17/00), 756 So.2d 1144. In order to trigger the concept of apparent authority, the third party must prove that the principal gave the third party reason to believe that the agent had authority to act on the principal's behalf with respect to the particular action taken and that the third party reasonably relied upon the manifested authority of the agent. Builders Supply of Ruston, Inc. v. Qualls, 32,630 (La.App.2d Cir.1/26/00), 750 So.2d 427.
The burden of proving apparent authority is on the party seeking to bind the principal. A third party may not blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purportedly granted by the principal permits the proposed act by the agent. Barrilleaux v. Franklin Foundation Hosp., 96-0343 (La.App. 1st Cir.11/8/96), 683 So.2d 348, writ denied, 96-2885 (La.1/24/97), 686 So.2d 864.
The Clampits were consistent in their testimony that Billiot never mentioned needing his manager's approval. Billiot contended that while he could not remember exactly what he had said, he recalled telling the Clampits that he had to bring their offer to management for approval. The trial court was skeptical about how Billiot could not remember most details of the alleged transaction, but yet he could remember telling the Clampits that he needed management approval. Nevertheless, it should have been obvious to the Clampits that management approval would eventually be a factor at some point in the sales process, as Billiot alerted them that he could cut the price for a cash deal without management approval. Equally important is that the four-square was clearly titled "OFFER TO PURCHASE" on the preprinted form. Finally, it is not clear from the record if the additional costs of a vehicle sale, such as taxes and registration fees, were factored into the figure of $20,000.00.
We note that the trial court did not address the issue of detrimental reliance when reaching its conclusion regarding apparent authority. Indeed, in its order denying the motion for new trial, the court stated, "As to the issue of detrimental reliance, none is required in this case." This is incorrect as proof of detrimental reliance is required when establishing apparent authority. Based on this record, we cannot conclude that the Clampits suffered *316 any detriment due to their reliance on Billiot's statements. The rejection of their offer was quickly conveyed to them. Their check was never negotiated; therefore, they never lost access to their funds.
We conclude that the trial court was clearly wrong in finding that the Clampits and Interstate Dodge had entered into a contract to sell the truck for $20,000.00.

SANCTIONS
Interstate Dodge argues that the trial court erred in not awarding sanctions under La. C.C.P. art. 863 for what Interstate Dodge considers was the filing of a frivolous suit. The trial court has discretion to impose sanctions under article 863, which is intended only for exceptional circumstances. City of Ruston v. Perritt, 30,896 (La.App.2d Cir.9/23/98), 718 So.2d 1044. This case is not an exceptional circumstance. The trial court was not manifestly erroneous in denying sanctions. Therefore, we affirm the denial of Interstate Dodge's claim for sanctions.

DECREE
At appellee's costs, we REVERSE that portion of the judgment decreeing that Jack Clampit is entitled to specific performance, and ordering Interstate Dodge to turn over the truck to Mr. Clampit upon payment of $20,000.00. We AFFIRM that portion of the judgment denying Interstate Dodge's claim for sanctions.