817 So.2d 427 (2002)
BAMBURG STEEL BUILDINGS, INC., Plaintiff-Appellee,
v.
LAWRENCE GENERAL CORPORATION and Caldwell Parish School Board, Defendants-Appellants.
No. 36,005-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 2002.
*429 Iley H. Evans, Caldwell Parish District Attorney, Columbia, for Appellant, Caldwell Parish School Board.
Carl B. Duke, Jr., Assistant District Attorney, Donald L. Kneipp, Monroe, for Appellee.
Before BROWN, PEATROSS & KOSTELKA, JJ.
PEATROSS, J.
This appeal arises from a judgment of the trial court in favor of general contractor Bamburg Steel Buildings, Inc. ("Bamburg") and against Caldwell Parish School Board ("School Board") for $275,111 (representing the amount sought by Bamburg for completion of the rebuilding of Kelly Elementary School located in Caldwell Parish), less a credit of $149,000 (representing funds from the Louisiana Insurance Guaranty Association), with legal interest. The School Board appeals, asserting nine assignments of error. For the reasons stated herein, we reverse the judgment of the trial court and render judgment in favor of Defendant School Board.

FACTS
In May 1993, Kelly Elementary School ("Kelly"), located in Caldwell Parish, was struck by lightning and destroyed by fire. The loss was covered by a contract of insurance between United Community Insurance Company ("UCIC") and the School Board. The insurance policy provided for four "options" in the event of such loss:
4. Loss Payment
a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:
(1) Pay the value of lost or damaged property;
(2) Pay the cost of repairing or replacing the lost or damaged property;
(3) Take all or any part of the property at an agreed or appraised value; or
(4) Repair, rebuild or replace the property with other property of like kind and quality.
The parties dispute whether UCIC or the School Board was entitled to, and actually made, the election between the above options; but, there is no dispute that the option chosen was for UCIC to rebuild the structure.
*430 UCIC hired its sister corporation, Lawrence General Corporation[1] ("Lawrence General") to consult and assist UCIC on issues including whether or not the school could and should be rebuilt, assessing the total loss to the School Board and on-site adjusting. Once the decision was made to rebuild, Gerald Gesser was hired as the architect for the project and Bamburg was selected as the general contractor. A contract of construction was executed in Ouachita Parish on March 22, 1994, with Lawrence General listed as the owner and Bamburg as the general contractor. The School Board was not a party to the contract of construction.
During the construction process, four applications for payment were submitted by Bamburg to Lawrence General, the first three of which were paid in full by UCIC. The fourth application for payment, however, was not paid by UCIC as that entity, along with Lawrence General, had been experiencing financial difficulties and ultimately went into receivership in the state of New York. Consequently, neither Bamburg nor Mr. Gesser was fully compensated for work on the project. Bamburg subsequently filed suit against UCIC, Lawrence General and the School Board asserting three causes of action: (1) breach of contract, (2) unfair trade practices and (3) unjust enrichment.
The School Board then requested and received $149,000 from the Louisiana Insurance Guaranty Association ("LIGA") to assist in paying Bamburg. In exchange for the LIGA funds and the School Board's agreement to use its best efforts to obtain funds from legislative sources, Bamburg agreed to dismiss its suit against the School Board and further agreed to a forum selection clause providing that any additional litigation would be brought in Caldwell Parish. The parties disagree as to the diligence of the School Board to obtain a legislative appropriation, but agree that none was secured. Bamburg maintained its suit in Ouachita Parish against the School Board and Lawrence General, which was in bankruptcy by this time in New York. All proceedings against Lawrence General, therefore, were automatically stayed. 11 U.S.C.A. § 362. UCIC was released from the law suit with the payment of the LIGA funds. The action against the School Board proceeded.

ACTION OF THE TRIAL COURT
Two pretrial rulings of the trial court have been raised as issues on appeal. First, the School Board filed a "Motion to Dismiss or Transfer" seeking a dismissal or transfer of the suit from Ouachita Parish to Caldwell Parish under the terms of the above-mentioned forum selection clause in the settlement agreement. The trial court denied the motion, finding that venue was proper in Ouachita Parish. Second, at the opening of trial, the School Board objected to proceeding in the absence of Lawrence General, arguing that Lawrence General was a necessary and indispensable party, made unavailable due to the automatic stay. After discussion with counsel on this issue, the trial court allowed the trial to proceed.
Trial commenced with Bamburg claiming that the School Board was contractually obligated because Lawrence General was its agent, which bound the School Board for the obligation. As previously stated, in the alternative, Bamburg pled unjust enrichment and unfair trade practices. At the close of Bamburg's evidence, the trial court granted a directed verdict in favor of the School Board on *431 the unfair trade practices claim. Ultimately, however, the trial court found that the School Board was "intimately involved" in the rebuilding project and that, as far as Bamburg was concerned, an agency relationship was implied between Lawrence General and the School Board. Judgment was cast in favor of Bamburg in the amount of $275,111, less a credit of $149,900 (the LIGA funds), with legal interest. The issue of unjust enrichment was not reached or discussed by the trial court.

DISCUSSION
As previously stated, the School Board has assigned nine alleged errors on the part of the trial court in this case. In light of our decision in this appeal to reverse the judgment of the trial court and render judgment in favor of the School Board, we pretermit any discussion of certain pre-trial and evidentiary rulings raised by the School Board. As a preliminary matter, however, we will briefly address the assignments of error regarding venue.

Venue
The denial of the motion to transfer the suit from Ouachita to Caldwell Parish was clearly an adverse ruling for the School Board; however, the School Board did not appeal that interlocutory judgment. It is a well-established rule that the overruling of an exception to venue may cause irreparable harm and, therefore, is an appealable interlocutory Judgment either by ordinary appeal under La. C.C.P. art.2083 or through the supervisory writ process under La. C.C.P. art. 2201. See also Chambers v. LeBlanc, 598 So.2d 337 (La.1992); Danny Weaver Logging, Inc. v. Norwel Equipment Company, 33,793 (La.App.2d Cir.8/23/00), 766 So.2d 701; Caldwell v. VAC Federal Credit Union, 545 So.2d 697 (La.App. 2d Cir. 1989), and cases cited therein. This is so because the effect of such a judgment may be litigating a case in a parish of improper venue, which cannot, as a practical matter, be corrected on appeal. Danny Weaver Logging, supra; Caldwell, supra. A party must timely exercise his or her right of appeal from an adverse interlocutory judgment, such as one overruling a motion to transfer based on improper venue, before the party chooses to further utilize the judicial process in the wrong venue. Otherwise, the party waives reassertion of the venue issue. Danny Weaver Logging, supra. Since the School Board failed to timely appeal the denial of its motion to transfer, reassertion of the venue issue has been waived and any error in the ruling of the trial court cannot be corrected in this appeal. We now turn to the issue of the alleged agency relationship between Lawrence General and the School Board.

Agency
The primary issue on appeal requires a review of the trial court's finding that an agency relationship existed between Lawrence General and the School Board thereby allowing liability on the part of the School Board for the balance of payment due Bamburg. Recall that the contract of construction was executed by and between Lawrence General and Bamburg; the School Board was not a party to the contract and the evidence clearly shows that all parties knew that the contract was between Lawrence General and Bamburg and not the School Board. Clearly, there was no privity of contract. In order, therefore, to find liability for payment under the contract of construction, Bamburg had to prove an agency relationship between Lawrence General and the School Board.
A trial court's determination of an agency relationship is essentially a factual matter; and, therefore, our review of the *432 trial court's factual findings is governed by the manifest error standard of review. Webb v. Lagniappe Hospital Corporation, 30-659 (La.App.2d Cir.6/24/98), 714 So.2d 901. Under this standard, the reviewing court may reverse only if it finds that no reasonable factual bases exist for the findings of the trial court which are clearly wrong or manifestly erroneous. Payne v. Lawn Lourd Lawn Service, 35,491 (La. App.2d Cir.12/5/01), 803 So.2d 321; Wilkerson v. Kansas City Southern Ry., 33,922 (La.App.2d Cir.11/1/00), 772 So.2d 268, writ denied, 00-3526 (La.2/16/01), 786 So.2d 105. In the case sub judice, we find that the trial court manifestly erred in finding an agency relationship.
An agency relationship may be created by express appointment of a mandatary under La. C.C. art. 2985 or by implied appointment arising from apparent authority in order to protect third parties. Builders Supply of Ruston, Inc. v. Qualls, 32,630 (La.App.2d Cir.1/26/00), 750 So.2d 427. In Qualls, we explained the law on apparent authority:
Apparent authority is a jurisprudentially created concept of estoppel which operates in favor of a third person and binds the principal for the unauthorized acts of an apparent agent. To trigger the concept of apparent authority, the third party must prove that the principal gave the third party reason to believe that the agent had authority to act on the principal's behalf with respect to the particular action taken and that the third party reasonably relied upon the manifested authority of the agent. Casten v. Cordell, 26,487 (La.App.2d Cir.01/25/95) 649 So.2d 123, citing Boulos v. Morrison, 503 So.2d 1 (La.1987). Implied or apparent agency exists if the principal has the right to control the conduct of the agent and the agent has the authority to bind the principal. Barrilleaux v. Franklin Foundation Hospital, 96-0343 (La.App. 1st Cir.11/08/96), 683 So.2d 348, writ denied, 96-2885 (La.01/24/97), 686 So.2d 864.
In order for the third party to hold the principal liable under the doctrine of apparent authority, it must show a reliance on the conduct of the principal and a change of position on its part such that it would be unjust to allow the principal to deny the agency. Clampit v. Interstate Dodge, Inc., 34,125 (La.App.2d Cir.11/15/00), 771 So.2d 311, writ denied, 00-3412 (La.2/2/01), 784 So.2d 649. Apparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes this. McManus v. Southern United Fire Ins., 00-1456 (La. App. 3d Cir.3/21/01), 801 So.2d 392. Further, an agency relationship is never presumed; it must be clearly established. Id.; Cartinez v. Reliable Amusement Co., Inc., 99-333 (La.App. 3d Cir.11/3/99), 746 So.2d 246, writ denied, 99-3404 (La.2/4/00), 754 So.2d 235; Barrilleaux v. Franklin Foundation Hospital, 96-0343 (La.App. 1st Cir.11/8/96), 683 So.2d 348, writ denied, 96-2885 (La.1/24/97), 686 So.2d 864; Fleet Finance, Inc. v. Loan Arranger, Inc., 604 So.2d 656 (La.App. 1st Cir.1992). The burden of proving apparent authority is on the party seeking to bind the principal. A third party may not blindly rely on the assertions of an agent, but has a duty to determine, at his peril, whether the agency purportedly granted by the principal permits the proposed act by the agent. McManus, supra; Cartinez, supra; Desormeaux v. Lalonde, 578 So.2d 226 (La.App. 3d Cir.1991), writs denied, 581 So.2d 705 and 706 (La.1991). One must look from the viewpoint of the third party to determine whether an apparent agency has been created. Cartinez, supra; AAA Tire & Export, Inc. v. Big Chief Truck Lines, Inc., 385 So.2d 426 (La.App. 1st Cir.1980).
*433 Thus, simply stated, the question of apparent authority turns on whether the principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority. Logically, such a rule for the protection of third parties requires some indication to the third party by the principal of a recognition of the mandatary or agent. Here, there was no such manifestation or indication from the School Board (the alleged principal) to Bamburg (the third party) which might have pointed to Lawrence General's (the alleged agent) authority to act on the School Board's behalf. In fact, James Turner, the superintendent of Caldwell Parish School Board at the time of construction, testified consistently that Lawrence General was not acting as agent of the School Board. When asked to explain, Mr. Turner simply stated "We didn't hire [Lawrence General]. We had no input into [Lawrence General] being there." Mr. Turner further testified that the School Board signed no contracts with Lawrence General nor did the School Board hold Lawrence General out to be its agent. As previously stated, Lawrence General was hired by its sister corporation, UCIC, and Lawrence General's then-president, Garen Szablewski, provided consistent and unwavering deposition testimony that Lawrence General was acting on behalf of UCIC, not the School Board:
A: We worked primarily as a consultant or an agent on [UCIC's] behalf related to major property losses that the insurance company handled.
* * *
A: I believe there was a contract [between UCIC and Lawrence General].
* * *
A. ... I would have considered ourselves an agent of UCIC.
* * *
Q: So, would it be fair to say that it was not a normal practice for an insured to hire Lawrence General?
A: Yes.
Q: And would it also be fair to say that it would not be normal practice for Lawrence General to be the agent of the underlying insured?
A: That's correct.
* * *
A: I would have to review the specific paperwork. But if Lawrence General was involved in the contract. In terms of the name, it would have been as an agent for UCIC....
Mr. Szablewski further testified that the initial role of Lawrence General was to assess the loss and advise UCIC as to the most cost-effective option to pursue of the options available under the contract of insurance. According to Mr. Szablewski, the final election of an option under the UCIC insurance contract was made by UCIC. In addition, Lawrence General made available candidates for the architectural work on the project, with the selection and hiring of the architect actually being done by UCIC. The School Board was not involved in these processes according to Mr. Szablewski. Moreover, when questioned about a letter authored by Steve Wightman, then Vice President of Lawrence General, to Bamburg which stated, in pertinent part, "we look forward to the successful completion of this project and we feel we have made a good choice in *434 our selection of a contractor," Mr. Szablewski testified that "[i]n the context of this letter, `we' would have been Lawrence General and UCIC" and he agreed that would not have included the School Board. He further testified regarding the letter as follows:
Q: As president of Lawrence General Corporation, what would you expect this document to indicate to the company with you as the President regardless of who in your employ has written it?
* * *
Q: Did you have an opinion, a personal opinion?
A: My opinionand it was fairly typical of our processthis would indicate to Lawrence General, the contractor, in this case Bamburg Steel, and UCIC were the controlling factors in the process.
In addition Lawrence General's answer to Bamburg's petition states that "Lawrence General was acting as the express, disclosed agent on behalf of the School Board and, therefore, Lawrence General has no liability to Bamburg." When asked if this statement is an accurate reflection of Lawrence General's relationship to the School Board, Mr. Szablewski answered, "No, it's not. I believe that should have read `disclosed agent on behalf of UCIC' and not the school board." A thorough review of the evidence contained in this record reveals no evidence of any manifestation of authority to Lawrence General by the School Board.
We also find no support in this record that Bamburg reasonably relied on any alleged agency relationship between Lawrence General and the School Board. First, Mr. Turner testified that Bamburg was not hired by the School Board nor did the School Board receive any applications for payment from Bamburg during the project or make any payment to Bamburg under the contract of construction. In fact, UCIC hired Bamburg and all applications for payment during the project were made by Bamburg directly to Lawrence General, which in turn presented them to UCIC. The first three applications for payment were paid by UCIC directly to Bamburg. In addition, Mr. Stan Bond, a partner in Bamburg and the Kelly project manager, testified that he knew that he was submitting a bid to Lawrence General and not the School Board, that he never entered into a contract with the School Board and that all applications for payment were made to Lawrence General. Further, Milton Bamburg, the founder, co-owner and President of Bamburg, acknowledged in his testimony that he knew that the only party with whom Bamburg was contracting was Lawrence General. Also telling is the testimony of Mr. Szablewski in this regard:
Q: Did you ever tell Milton Bamburg that Lawrence General is merely the agent of UCIC?
A: Yes, I did.
* * *
Q: You are certain you remember saying those words? ... But you have a specific recollection of telling Milton Bamburg that Lawrence General is only the agent of UCIC?
A: Yes, I do. And, again, I can't tell you specifically what the time or date of those were. But the reason I recall that is I was having similar time frame discussion with Mr. Breen from UCIC regarding payment to Mr. Bamburg. And we were very clear in our role and very clear as to what needed to be transmitted to the people that we were working with.

*435 * * *
A: ... there was that conversation [that Lawrence General was acting only as agent for UCIC] on at least one occasion, and I believe more, that we specifically talked in those terms.
Mr. Gesser provided similar testimony, stating that he was asked by UCIC to serve as architect on the project. He agreed that his contract was with UCIC and not the School Board and that he knew he did not "work for" the School Board. The totality of this evidence makes clear that Bamburg, the third party in this alleged agency situation, and even other parties working on the project, i.e., Mr. Gesser, were aware of which entities were responsible for payment under the contract of construction, Lawrence General and UCIC, not the School Board.
Much argument is presented by both parties concerning the amount of involvement in, and alleged control over, the rebuilding process exercised by the School Board. In fact, the trial court based its finding of agency exclusively on its factual findings regarding the School Board's "intimate involvement" in the project. We do not find error in the finding that the School Board was involved in the rebuilding process; however, we do find error in the conclusion that this involvement renders the School Board liable as a principal on the contract of construction between Lawrence General and Bamburg. The option chosen by UCIC under the contract of insurance required UCIC to rebuild or replace the lost property with other property of "like kind and quality." As the trial court acknowledged, the School Board was justifiably concerned "about the sufficiency and quality of any rebuilt structure and it was only natural for the Board to intimately involve itself in the rebuilding process." The record reveals that the project was on a short time line, commencing in March and having a completion date of August so that the school could be operating in the fall. For this reason, the initial plans or drawings for the project were "sketchy" and all parties were aware that details would be worked out during the project's completion. The details were manifested in the form of change orders. Mr. Wightman explained in his deposition as follows:
[W]e started with ... a schematic set of drawings, enough to get construction underway, but there were known to be a lot of decisions that would need to be made along the way by Caldwell School Board for their school, so as construction went along, they would observe or be involved in design meetings to choose alternatives or changes that they wanted made to the building.
It makes sense for the change orders to have emanated from the School Board since it was the School Board that was justifiably concerned with receiving a functionally equivalent structure. While the requested change orders may have originated with the School Board, we find significant Mr. Szablewki's testimony that "[i]t was a negotiating process between UCIC and the school board and the contractor in terms of what the school board may have asked for. And UCIC very typically would look at the request and would not always honor 100 percent what was being requested." It was error to find that the School Board dictated the construction process and had "veto" power over decisions concerning the rebuild.[2]
*436 We also note that the parties argue strongly over which entity, UCIC or the School Board, had the authority to, and actually made, the election of options under the contract of insurance. The plain unambiguous language of the contract of insurance provides that the election shall be made at UCIC's option. Mr. Szablewski testified unequivocally that the decision to rebuild rather than to make a payment to the School Board was made solely by UCIC, stating "that UCIC would independently exercise [the] option" under the contract of insurance.[3] Bamburg argues that a resolution passed by the School Board wherein the body resolves to rebuild Kelly, establishes that it was the School Board that made the election of options under the contract. Mr. Szablewski provided the only explanation of this resolution, testifying that he attended several meetings of the School Board wherein the body was discussing the possibility of redistricting and not rebuilding Kelly at all. In our opinion, such resolution merely evidences the intent of the School Board to maintain its current districts and accept the proposal of UCIC to rebuild Kelly. Bamburg also cites, as did the trial court, Mr. Wightman's testimony that the School Board made the final decision to rebuild. In any event, whether UCIC decided to allow the School Board to make the election or whether the School Board simply accepted UCIC's proposal to rebuild does not affect the determination of whether or not an agency relationship existed between the School Board and Lawrence General. As previously stated, all parties were well aware with whom they were contracting and dealing at all times. Further, Bamburg was well aware that UCIC was ultimately responsible for payment on the project and that the School Board was attempting to insure that the building was adequate and a like replacement for the lost structure.
Bamburg further argues that the School Board participated in, if not made, the decision as to which contractor would be awarded the contract. According to Bamburg, this alleged "control" by the School Board supports its assertion of an agency relationship between Lawrence General and the School Board. We disagree. Recall that the court is to view the facts and circumstances from the perspective of the third party, Bamburg. There is no testimony *437 from Mr. Bamburg or Mr. Bond that it was the School Board that hired Bamburg. To the contrary, both men testified that the contract of construction was with Lawrence General and not the School Board. The only testimony which suggests that the School Board was involved in the decision to hire Bamburg was that of Mr. Wightman, whose opinion is not instructive on the viewpoint or perspective of Bamburg. Thus, this testimony does not support Bamburg's alleged reliance on an agency relationship.
In summary, we are mindful that our standard of review leaves reasonable inferences of fact to the discretion of the trier of fact. When those determinations are clearly wrong, however, as in the case sub judice, this court must reverse. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Payne, supra; McGough v. Oakwood Mobile Homes, Inc., 34,091 (La.App.2d Cir.11/1/00), 779 So.2d 793. We agree with the School Board's succinct description in its brief of the circumstances of this case that everyone involved, including Bamburg, knew "that Lawrence General and UCIC had either an agency relationship or a contractual employer/employee relationship, that Lawrence General and Bamburg had a contract of construction, that UCIC was responsible for payment on that contract of construction, and that the School Board only exercised that certain amount of control sufficient to ensure that UCIC did not put-the-screws to the taxpayer of Caldwell Parish when it came time for UCIC to pay its insurance obligation." The trial court's finding that the School Board was a principal in an agency relationship with Lawrence General was error.

Unjust Enrichment
In light of our finding error in the ruling on agency as a basis for liability, we will address Bamburg's alternative theory of unjust enrichment asserted at the trial level and re-urged as an alternative theory on appeal. See La. C.C.P. art. 2133(B).[4]
Unjust enrichment is founded on the equitable principle that no one should be enriched at the expense of another. Although it is a remedy in equity, courts are discouraged from using the principle to remedy every unjust displacement of wealth. Tandy v. Pecan Shoppe of Minden, Inc., 34,578 (La.App.2d Cir.4/4/01), 785 So.2d 111; Caldwell Wholesale Co., Inc. v. Central Oil & Supply Corp., 32,937 and 32,938 (La.App.2d Cir.5/10/00), 761 So.2d 684, writ denied, 00-2151 (La.10/13/00), 771 So.2d 650. The doctrine of unjust enrichment is codified in La. C.C. art. 2298 which reads:
A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.

*438 The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered.[5]
In order to employ this remedy, each of the following elements must be proven: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment and (5) there must be no other remedy at law available to plaintiff. Tandy, supra; Caldwell, supra; Baker v. Maclay Properties Co., 94-1529 (La.1/17/95), 648 So.2d 888; Edmonston v. A-Second Mortg. Co. of Slidell, Inc., 289 So.2d 116 (La.1974); Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967). A plaintiff claiming unjust enrichment has the burden of proving each of the above elements by a preponderance of the evidence. Tandy, supra; Caldwell, supra.
Initially, we note that where a contract exists, there can be no recovery in quantum meruit. Tandy, supra. Bamburg argues in the alternative, therefore, that the contract of construction was illegal and null and void because it was for the building of a public school which falls within the ambit of the public bid law, La. R.S. 38:2211, et seq.[6] If successful, this argument would open the door to Bamburg's potential recovery under its alternative theory of unjust enrichment. We do not find it necessary to decide whether or not the contract of construction in this case was subject to the public bid law because, while the School Board may have received the benefit of the new building, we find no unjust impoverishment on the part of Bamburg.
It is not disputed that Bamburg did not receive from UCIC payment of the final installment under the contract of construction. Recall, however, that the fourth element of an unjust enrichment claim requires an absence of justification for the impoverishment. As we recognized in Tandy, supra, application of the legal elements of the doctrine of unjust enrichment cannot be made without consideration of the underlying facts and circumstances which make up the plaintiffs claim. In the case sub judice, Bamburg voluntarily entered into a contract of construction with Lawrence General, with the full awareness that the project was the rebuilding of a public school and knowing that UCIC was ultimately responsible for payment under the contract. Mr. Bamburg testified that his company had worked on public school projects in the past and was familiar with the public bidding process under the public bid law. Bamburg was well aware that this particular project was being funded by private funds in the control of UCIC rather than via bid letting. Despite the fact that it was a willing and eager party to this private *439 contract, Bamburg would now have this court declare the contract null and void as being in violation of the public bid law, an argument we find to be disingenuous. A party who knowingly and willingly enters into a contract cannot later successfully assert a claim in unjust enrichment or quantum meruit for services rendered under that contract by attacking the validity and legality of the contract. The critical factors in our so holding are, again, that Bamburg was experienced in both public and private works contracts and knew the "type" of contract into which it was entering from the inception. In executing this contract of construction, we find that Bamburg should have anticipated the risk that it may not be fully compensated under the construction contract and acted in such a way that both caused its alleged impoverishment and whatever enrichment the School Board may have received. See Tandy, supra, citing Gray v. McCormick, 94-1282 (La.App. 3d Cir.10/18/95), 663 So.2d 480 ("the impoverishment element is met only when the factual circumstances show that the impoverishment was not a result of the plaintiffs own fault or negligence or was not undertaken at his [sic] own risk.") Finding no unjust impoverishment in this case, we conclude that the doctrine of unjust enrichment is not applicable and need not discuss the remaining elements of the doctrine.
Finally, for the many reasons expressed throughout this opinion, we find no error in the trial court's grant of the School Board's motion for directed verdict on the claim of unfair trade practices.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed and judgment is rendered in favor of Caldwell Parish School Board. Costs are assessed to Bamburg Steel Buildings, Inc.
REVERSED AND RENDERED.
NOTES
[1] UCIC and Lawrence General are part of a group of corporations under the "umbrella" of a parent corporate entity named the Lawrence Group.
[2] In addition, Mr. Szablewski testified as follows regarding the involvement of the insured in a rebuilding project:

One of UCIC's requirements was that, ultimately, when the project was complete, that they had a happy insured. They would have hoped that the insurance relationship that had existed prior to the loss would continue after the reconstruction process. And in order to ascertain that the insured would be happy, one of Lawrence General's roles was to keep the school board in this particular case or the insured up to date on the nature of the construction when there was a choice A versus choice B and cost was not a factor to allow them to make certain choices in the project, to essentially be happy with what they ultimately received as an end product and, hopefully continue the insurance relationship with UCIC.
[3] Mr. Szablewski provided the following explanation of UCIC's motivation in electing to rebuild with its private funds:

Typically, the reason that that was done this way for this type of project is either Lawrence General or UCIC would be listed as the owner of the property because it was being rebuilt using private insurance funds as opposed to public funds that would be necessary if the school themselves were the owner. And one of the ramifications that UCIC as the insured's company would consider is if they are building it using their own private insurance dollars, that they would not have to get into some of the public bid requirements and some of the public construction requirements that would be necessary if that was not the case. So, typically, UCIC looked at themselves as being the physical owner of the rebuilt property until such time as the project was complete and they turned the ownership over to the insured; in this case, the school board.
[4] La. C.C.P. art. 2133(B) provides:

A party who does not seek modification, revision, or reversal of a judgment in an appellate court, including the supreme court, may assert, in support of the judgment, any argument supported by the record, although he has not appealed, answered the appeal, or applied for supervisory writs.
[5] This article became effective January 1, 1996, which post-dates the filing of this suit. The comments to the article, however, indicate that it does not change the law, rather "[i]t expresses the principle of enrichment without cause that was inherent but not fully expressed in the Louisiana Civil Code of 1870. The formulation of the principle accords with civilian doctrine and jurisprudence."
[6] Public contract bid law requires that all public work done by a public body be advertised for competitive bids and that the contract be awarded to the lowest responsible bidder. La. R.S. 38:2211-26. The purpose of requiring public work to be let out for bidding is to prevent public officials from awarding contracts on the basis of favoritism or at possibly exorbitant and extortionate prices. Webb Const., Inc. v. City of Shreveport, 30,491 (La.App.2d Cir.5/13/98), 714 So.2d 119.